Richard PARKS, Marilyn Parks, and Lester Parks, by his parents and next friends, Richard Parks and Marilyn Parks, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Ivan PAVKOVIC, Director, Department of Mental Health and Developmental Disabilities, Edward Copeland, Chairman, Illinois State Board of Education, Ruth Love, Superintendent, Chicago Public Schools, Patricia Barger, Representative, Department of Mental Health and Developmental Disabilities, Robert Mandeville, Director, Bureau of the Budget, William Kempiners, Director, Department of Public Health, Jeffrey Miller, Director, Department of Public Aid, Gregory Coler, Director, Department of Children and Family Services, Robert Granzeier, Acting Director, Department of Vocational Rehabilitation, Donald Gill, State Superintendent of Education, individually and in their official capacities, Defendants.

No. 82 C 965.

United States District Court, N. D. Illinois, E. D.

March 19, 1982.

Mark C. Weber, Mandel Legal Aid Clinic, Chicago, Ill., for plaintiffs.

Robert John Connor, Ill. Dept. of Mental Health & Developmental Disabilities, Tyrone C. Fahner, Atty. Gen., Paul Millichap, Asst. Atty. Gen., Robert J. Krajcir, Christine Holtz, Bd. of Ed., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MARSHALL, District Judge.

Plaintiffs in this action are Lester Parks and his parents and next friends, Richard and Marilyn Parks.[1]  Lester is currently 17

---

1.  Plaintiffs also seek to represent the class of all persons similarly situated.  The parties have indicated that they wish to engage in discovery

years old, and has autistic characteristics, moderate mental retardation, severe emotional disturbances, speech and language impairments, and behavioral disorders. Because of these handicaps, Lester qualifies as a handicapped child entitled to the protections of the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401–61 (1976), see id. § 1401(1) ("The term 'handicapped children' means mentally retarded, ... speech impaired, ... seriously emotionally disturbed [children] ... who by reason thereof require special education and related services."), and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. II 1978), see id. § 706(7)(B) ("[T]he term 'handicapped individual' means ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment."). Lester is in need of special education and related services in a residential facility due to the severity of his handicaps. In early 1980, Lester resided in a facility called the New Hope Living and Learning Center, which provided Lester with educational and other services enabling him to receive an education which he would not have been able to receive in a nonresidential public school. At the time, however, Lester's parents feared that New Hope was in danger of closing.[2] As a result, they requested help from the Chicago Board of Education ("CBE") in locating and placing Lester in a new facility suitable for his educational needs. CBE never did find an appropriate placement for Lester.

At some point, it appears that someone requested that the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD") also locate and place Lester in a suitable facility, for in July, 1980, DMHDD placed Lester in Willowglen Academy, a residential treatment facility in Milwaukee, Wisconsin. Lester has remained at Willowglen ever since. Plaintiffs do not challenge DMHDD's placement of Lester; to the contrary, they appear to be satisfied with the education Lester is receiving at Willowglen. What they do challenge, however, is the failure of various state agencies and CBE to assume the full cost of Lester's placement at Willowglen.[3] Plaintiffs allege that Lester has a right, under the Education for All Handicapped Children Act ("EHA") and § 504 of the Rehabilitation Act[4] to a free appropriate public education, and that this right has been denied by defendants' refusal to assume all the costs associated with Lester's education. The specific allegations, as yet undenied by defendants, are that: (1) DMHDD refuses to assume $100 per month of the costs of Lester's placement at Willowglen, denominating that amount "responsible relative liability." Thus, for every month since July, 1980, the "Individual Care Grant" Lester receives from DMHDD has been reduced by $100. (2) DMHDD has reduced its funding of Lester's placement further by refusing to pay for amounts it claims are attributable to "clothing and allowance." DMHDD refused to pay $17.24 per month for this reason from July, 1980 through December, 1980, and has refused to pay $1.42 per day from January 1, 1981 through December 31, 1981 on the ground that this amount was attributable to "clothing, medical supplies

---

before presenting the question of class certification to the court.

2. There is some dispute, largely irrelevant to the issues presented by this case, as to whether Lester's parents' fears were justified.

3. In addition to the policies mentioned in text, plaintiffs also allege that CBE unlawfully fails to place handicapped children in residential facilities within a reasonable time, and delays funding applications, and that the Illinois State Board of Education unlawfully refuses to meet time deadlines for deciding hearings and appeals related to such placements. However, the questions raised by these allegations need not be answered in order to provide plaintiffs with the preliminary relief now sought.

4. Section 504 prohibits discrimination against otherwise qualified handicapped individuals. Since we conclude below that the bulk of the relief plaintiffs seek under § 504 is barred by the eleventh amendment, the bulk of the discussion in this opinion will concern the EHA, and not § 504.

and purchased services." [5] (3) DMHDD has not yet approved a 1982 rate for Lester's expenses at Willowglen, and is paying those expenses at a lower, 1981 rate.[6] (4) DMHDD has refused to pay Lester's speech therapy costs, payable to "Bell Therapy," incurred prior to August 17, 1981. (5) DMHDD, CBE and the Illinois State Board of Education ("ISBE") have refused to pay Lester's special education and related services expenses for periods prior to the time Lester and Willowglen were approved for funding. Willowglen was not approved until September, 1981, and Lester was not approved until January 22, 1982. There is some dispute as to why this delay occurred. The state defendants blame Willowglen for its failure to obtain earlier approval. As to the failure to approve Lester for funding prior to January 22, 1982, there is no explanation in the record. Whatever the reasons, there is no allegation that Lester is at fault for either delay. (6) ISBE, and apparently DMHDD and CBE as well, have refused to pay for Lester's tuition at rates in excess of the rate approved for Willowglen by the Governor's Purchased Care Review Board ("GPCRB"). GPCRB is responsible under state law for ensuring that the state meets its obligations to provide handicapped students with an appropriate education by promulgating appropriate guidelines and standards. *See* Ill.Rev.Stat., ch. 122, § 14-7.02 (1979). The current GPCRB-approved rate does not meet Lester's actual expenses at Willowglen.

Sometime in 1981, Lester's parents requested a due process hearing from CBE at which they would be able to air their complaints about CBE's alleged failure to provide Lester with an appropriate free education. There is some dispute as to exactly when the hearing was requested. What is agreed is that a hearing was held on December 1, 1981, and a decision rendered on December 8, 1981. The hearing officer decided that CBE had breached its duty to provide Lester with an appropriate free public education, and required CBE to assume Lester's costs in the future.[7] However, the officer declined to order CBE to assume responsibility for costs assessed to Lester's parents in the past; the decision has prospective force only. Plaintiffs appealed the officer's decision on January 5, 1982. Apparently because of a delay caused by CBE,[8] the case has not been decided yet by ISBE, despite the fact that federal law requires ISBE to reach a final decision within 30 days of receipt of plaintiffs' request for review. *See* 34 C.F.R. § 300.-512(c).

At the present time, Lester has an outstanding bill at Willowglen in the amount of $2,154.53.[9] Because of the unpaid bill, Willowglen has issued a discharge notice to Lester which will become effective on March 25, 1982. The notice was issued on January 25, 1982. Plaintiffs, no longer feeling capable of waiting until their appeal was decided by ISBE, filed the instant action. Named as defendants were Ivan Pavkovic, Director of DMHDD, Edward Copeland, Chairman of ISBE, Dr. Ruth Love, Superintendent of CBE, Robert Mandeville, Director of the Illinois Bureau of Public Aid, Gregory Coler, Director of the Illinois Department of Children and

---

**5.** The record does not reveal what DMHDD's policy subsequent to January 1, 1982 is.

**6.** While the complaint does not make the matter entirely clear, it appears that the 1981 rate is inadequate to meet Lester's current actual expenses.

**7.** It is unclear whether the decision requires CBE to assume those costs which the state defendants assess to plaintiffs.

**8.** There is no allegation that plaintiffs are at fault for the delay. The parties appear to agree that the delay was caused by CBE's failure to

provide plaintiffs with a copy of the hearing transcript in a timely fashion.

**9.** While there is some dispute as to the precise amounts of money in each category which defendants have refused to assume, defendants have not as yet denied that the total outstanding bill at Willowglen comes to $2,154.53, or that Lester will be discharged if the bill is not paid by March 25, 1982. Lester also has a bill from Bell Therapy for speech therapy outstanding in the amount of $222.52. However, it appears Lester is currently receiving all the speech therapy he needs, and has no need for preliminary relief regarding that amount.

Family Services, Robert Granzeier, Acting Director of the Illinois Department of Vocational Rehabilitation, Donald Gill, Illinois State Superintendent of Education, William Kempiners, Director of the Illinois Department of Public Health, and Patricia Barger, an employee of DMHDD. Defendants Mandeville, Miller, Coler, Granzeier, Gill, Barger and Kempiners are members of GPCRB. This court's jurisdiction rests on 28 U.S.C. § 1331 (West Supp.1981) and 20 U.S.C. § 1415(e) (1976). Currently before the court is plaintiffs' motion for preliminary injunctive relief requiring defendants to pay Lester's outstanding bill so that Lester will not be discharged from Willowglen prior to trial on the merits.

I

While defendants agree that Lester is handicapped and entitled to the protections of the EHA, they do not agree that he has a private right of action to enforce the provisions of the Act by means of the instant suit. There is authority for the proposition that there is no private right of action, under the EHA, to obtain judicial review on the merits of the decisions of state and local educational agencies regarding the provision of a free appropriate public education to handicapped children. *See McCowen v. Hahn*, No. 78 C 4233, slip op. at 8–11 (N.D. Ill. July 27, 1981); *Miener v. Missouri*, 498 F.Supp. 944 (E.D.Mo.1980) *rev'd in relevant part*, 673 F.2d 969 (8th Cir. 1982); *Loughran v. Flanders*, 470 F.Supp. 110, 114 (D.Conn.1979). However, this position has been rejected by two courts of appeal, including the court of appeals for this circuit. *See Miener v. Missouri*, 673 F.2d 969, at 975 (8th Cir. 1982); *Anderson v. Thompson*, 658 F.2d 1205, 1210 n.7 (7th Cir. 1981).[10] These cases hold that the EHA, in 20 U.S.C. § 1415 (1976), explicitly creates a private right of action, and permits plaintiffs in

those actions to obtain review, on the merits, of the relevant educational agencies' decisions regarding the provision of a free appropriate public education to the plaintiffs.

In § 1415(b)(1)(E), the EHA requires that state and local educational agencies provide handicapped children and their parents with

> an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.

Since the statute is phrased in the alternative, it is clear that the complaint can be addressed solely to the alleged failure to provide a free appropriate public education.[11] Lester's parents presented such a complaint, and received a hearing as required by § 1415(b)(2), and then appealed as was their right under § 1415(c). Having taken these steps, Lester and his parents are explicitly provided with

> the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. *Id.* § 1415(e)(2).

The EHA explicitly provides both a right to present a complaint regarding the provision of a free appropriate public education for Lester, and to obtain review in this court in order to protect that right. *See* 121 Cong. Rec. 37414–16 (1975) (remarks of Sen. Williams); 121 Cong.Rec. 37031 (1975) (remarks of Rep. Mink). *See also* Sen.Rep.No.94–168, 94th Cong., 1st Sess. 26 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 1425, 1450 (1975) [hereinafter cited as Sen.

---

**10.** While the *Anderson* court dealt with the issue only briefly, the private right of action question was argued at some length by the defendant-appellees. *See* Brief for Defendant-Appellee, School Board at 8–18, *Anderson v. Thompson*, 658 F.2d 1205 (7th Cir. 1981).

**11.** *See also* Sen.Conf.Rep. No. 94–455, 94th Cong., 1st Sess. 49 (1975), reprinted in [1975] U.S.Code Cong. & Ad.News 1480, 1502 (1975).

Rep.].[12]  Defendants' private right of action argument is without merit.[13]

## II

■ Closely related to the private right of action question is the question whether plaintiffs have properly exhausted their administrative remedies as required by the EHA.[14] Defendants do not argue the point. Nevertheless, the exhaustion question is sufficiently jurisdictional so as to require us to consider it on our own motion.

While § 1415(e)(2) of the EHA creates a private right of action, that right is only granted to a party "aggrieved" by the findings of the state agency. However, plaintiffs have not yet received a decision from ISBE on their appeal from the findings of the CBE hearing officer. This raises the question of whether plaintiffs are entitled to proceed in this court until ISBE has acted on their appeal, i.e., are they, as yet, "aggrieved."

■ Exhaustion of administrative remedies is not required under the EHA when their pursuit would be futile or meaningless as a practical matter. 121 Cong.Rec. 37416 (1975) (remarks of Sen. Williams); *Ezratty v. Puerto Rico*, 648 F.2d 770, 774 (1st Cir. 1981); *Monahan v. Nebraska*, 645 F.2d 592, 597 (8th Cir. 1981); *H. R. v. Hornbeck*, 524 F.Supp. 215, 219–22 (D.Md.1981); *Garrity v. Gallen*, 522 F.Supp. 171, 220–21 (D.N.H. 1981); *Sessions v. Livingston Parish School Board*, 501 F.Supp. 251, 254 (M.D.La.1980); *Larry P. v. Riles*, 495 F.Supp. 926, 963 (N.D. Cal.1979); *Doe v. Koger*, 480 F.Supp. 225, 228 (N.D.Ind.1979); *Armstrong v. Kline*, 476 F.Supp. 583, 601–02 (E.D.Pa.1979), *aff'd in part and remanded sub nom. Battle v. Pennsylvania*, 629 F.2d 269 (3d Cir. 1980), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 781 (1981); *Harris v. Campbell*, 472 F.Supp. 51, 54 (E.D.Va.1979); *Loughran v.*

*Flanders*, 470 F.Supp. 110, 112 (D.Conn. 1979); *New York Association for Retarded Children, Inc. v. Carey*, 466 F.Supp. 479, 486 (E.D.N.Y.1978), *aff'd*, 612 F.2d 644 (2d Cir. 1979). For two reasons, this doctrine applies to the instant case.

First, because of the press of time, plaintiffs have had no practical opportunity to obtain a decision from ISBE. They have done everything possible to obtain speedy administrative review, but have been unable to do so through no fault of their own. In fact, it is defendants who are at fault, because of their failure to decide plaintiffs' administrative appeal within the time specified by federal law. Moreover, the exhaustion rule of the EHA was intended to preserve the status quo by ensuring that no change in the child's placement occurs pending administrative appeal. *See New York Association for Retarded Children v. Carey*, 466 F.Supp. at 486, *see generally* 20 U.S.C. § 1415(e)(3) (1976); *Stemple v. Board of Education*, 623 F.2d 893 (8th Cir. 1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). Here, the purpose of the exhaustion requirement would be undermined by remanding plaintiffs to their administrative remedies, since it appears that they will be unable to obtain a decision before the time that Willowglen discharges Lester, and alters the status quo. When the press of time makes exhaustion impractical, it is not required by the EHA. *See North v. District of Columbia Board of Education*, 471 F.Supp. 136, 141 n.8 (D.D.C. 1979).

Second, it appears that plaintiffs have no real administrative remedy in this case. Plaintiffs do not merely challenge a particular adjudicative decision made regarding Lester's individual needs. Rather, they challenge statewide policies regarding payment of the educational expenses of handi-

---

12.  *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) held that the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000–81 (1976 & Supp. II 1978) did not create judicially enforceable rights for the developmentally disabled. However, that statute contained no provision expressly authorizing district courts to engage in review under the Act. Thus, the statute bears little resemblance to the EHA.

13.  In this circuit, it is settled that there is a private right of action under § 504 of the Rehabilitation Act, at least for injunctive relief. *See Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977).

14.  We will assume arguendo that exhaustion is also required under the Rehabilitation Act, though that is far from clear.

capped children in Illinois. It is doubtful at best if the administrative review plaintiffs have yet to obtain can provide the relief plaintiffs seek, since it appears that ISBE, by adopting the policies in question, has already predetermined the result it will reach in Lester's case. This is especially true since many if not all of the actions defendants have taken in this case appear to be required by state law. *See* Ill.Rev. Stat. ch. 91½, §§ 5–105 to 5–106, 5–116 (1979). Under these circumstances, exhaustion is not required. *See Riley v. Ambach*, 508 F.Supp. 1222, 1235–36 (E.D.N.Y.1980), *rev'd*, 668 F.2d 635 (2nd Cir. 1981).

### III

In order to obtain preliminary relief, plaintiffs must demonstrate the presence of four factors: reasonable likelihood of success on the merits; that plaintiffs' remedy at law is inadequate or that plaintiffs will be irreparably harmed if they fail to obtain preliminary relief; that the threatened injury to plaintiffs outweighs the threatened harm to defendants if the injunction does not issue; and that the granting of a preliminary injunction will serve the public interest. *O'Connor v. Board of Education*, 645 F.2d 578, 580 (7th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981).

### A

On the merits, the essence of plaintiffs' claim is that defendants have abrogated their duty to provide Lester with a free appropriate public education by failing to meet fully the costs of Lester's placement at Willowglen. Under the EHA, it is clear that Lester has a right to a free appropriate public education. The statutory preamble states that, "It is the purpose of this Act to assure that all handicapped children have

available to them, within the periods specified ... a free appropriate public education." Pub.L.No.94–142, § 3(a), (c), 89 Stat. 775 (1975). The Act goes on to state that participating states must provide a free appropriate public education to all children ages three to eighteen by September 1, 1978, and to all children ages three to twenty-one by September 1, 1980. 20 U.S.C. § 1412(2)(B) (1976). Local educational agencies in participating states are also required to provide a free appropriate public education. *Id.* § 1414(a)(1)(C)(ii). The legislative history makes it clear that Congress intended states to adhere to the deadlines provided in the Act. *See* House Rep.No.94–332, 94th Cong., 1st Sess. 15 (1975); Sen. Rep., *supra* at 3, 17–18, 45, U.S.Code Cong. & Ad.News 1975, 1427, 1440–41, 1468. The history of the Act makes it clear that participating states "must have a policy in current effect which assures that *all* handicapped children have the right to a free appropriate public education." Sen.Rep. at 45, U.S.Code Cong. & Ad.News 1975, 1468 (emphasis in original). *See* House Rep.No. 94–332, 94th Cong., 1st Sess. 15 (1975); 121 Cong.Rec. 37420 (1975) (remarks of Sen. Hathaway); 121 Cong.Rec. 37418 (1975) (remarks of Sen. Biden); 121 Cong.Rec. 37417 (1975) (remarks of Sen. Schweiker); 121 Cong.Rec. 37414 (1975) (remarks of Sen. Williams); 121 Cong.Rec. 37030 (1975) (remarks of Rep. Daniels); 121 Cong.Rec. 37028 (1975) (remarks of Rep. Ford); 121 Cong.Rec. 23704 (1975) (remarks of Rep. Brademas); 121 Cong.Rec. 19492 (1975) (remarks of Sen. Williams); 121 Cong.Rec. 19483 (1975) (remarks of Sen. Randolph). In sum, as one court stated, the mandate of the Act requiring the provision of a free appropriate public education "is quite unequivocal." *Tatro v. Texas*, 625 F.2d 557, 563 (5th Cir. 1980).[15]

---

15. Exactly how unequivocal the mandate is is demonstrated by the fact that Congress explicitly stated that states may not use lack of available funds as a justification for failure to provide a free appropriate public education. For example, the Senate Report states,

The Committee rejects the argument that the Federal Government should only mandate

services to handicapped children if, in fact, funds are appropriated in sufficient amounts to cover the full cost of this education. The Committee recognizes the State's primary responsibility to uphold the Constitution of the United States and their own State Constitutions and State laws as well as Congress' own responsibility under the 14th Amend-

■ The requirement of a free appropriate public education includes the guarantee that when a handicapped child is placed at a residential facility such as Willowglen, the placement must be free of cost to the child's parents.

If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child. 34 C.F.R. § 300.302 (1981).

*See* Sen.Conf.Rep.No.94–455, 94th Cong., 1st Sess. 41, *reprinted in* [1975] U.S.Code Cong. & Ad.News 1480, 1494 (1975) [hereinafter cited as Conf.Rep.]; House Rep.No. 94–332, 94th Cong., 1st Sess. 18, 21 (1975); Sen. Rep., *supra* at 32, U.S.Code Cong. & Ad.News 1975, 1456; *Riley v. Ambach*, 508 F.Supp. 1222, 1244–47, *rev'd on other grounds*, 668 F.2d 635 (2nd Cir. 1981); *Kruelle v. Biggs*, 489 F.Supp. 169, 173 (D.Del.1980); *North v. District of Columbia Board of Education*, 471 F.Supp. 136, 139–41 (D.D.C.1979).

■ The provision of a free appropriate public education must also include provision of "related services." 20 U.S.C. § 1401(18) (1976); *see Tokarcik v. Forest Hills School District*, 665 F.2d 443, 455–59 (3d Cir. 1981); *Tatro v. Texas*, 625 F.2d 557, 562–64 (5th Cir. 1980); *Papacoda v. Connecticut*, 528 F.Supp. 68 (D.Conn.1981). The scope of the "related services" which must be provided is quite broad. *See* 20 U.S.C. § 1401(17) (1976).

[T]he term "related services" means transportation and such developmental, corrective, and other supportive services as are required to assist a handicapped child to benefit from special education, and includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation, early identification and assessment of disabilities in children, counseling services, and medical services for diagnostic or evaluation purposes. The term also includes school health services, social work services in schools, and parent counseling and training. 34 C.F.R. § 300.13(a) (1981).

Under the EHA, while the ultimate responsibility for assuring compliance with federal law rests with ISBE, *see* 34 C.F.R. § 300.600 (1981), the Act's requirements also apply to all other state and local departments involved with the education of handicapped children. *Id.* § 300.2(b).[16]

There is no dispute that the outstanding bill for services provided to Lester at Willowglen involves the provision of special education and related services. There is also no dispute that placement at Willowglen was necessary and was necessary by DMHDD in order to provide Lester with special education and related services. This being the case, the unambiguous mandate of federal law is that these services be provided at no cost to Lester's parents. While defendants' refusal to meet fully Lester's expenses may be authorized by state law, such laws are inconsistent with the mandate to provide an appropriate free public education, and cannot stand. *See* 20 U.S.C. §§ 1412(6), 1414(a)(6) (1976); House Rep.No.94–332, 94th Cong., 1st Cong., 1st Sess. 29 (1975); Sen.Rep., *supra* at 4, U.S. Code Cong. & Ad.News 1975, 1428.

Defendants launch a number of arguments which are entirely irrelevant to the case at hand. First, defendants argue that the the members of GPCRB are not authorized under state law to provide plaintiffs with the relief they seek. That is exactly the problem. The nub of this case is that state law is inconsistent with the EHA. Since the GPCRB is bound by the EHA, it is the EHA itself which requires the GPCRB to alter its practices, and protect plaintiffs' right to a free appropriate public

---

ment to assure equal protection of the law. Sen.Rep. at 22, U.S.Code Cong. & Ad.News 1975, 1446.

To similar effect, *see* 121 Cong.Rec. 37025 (remarks of Rep. Mink); 121 Cong.Rec. 19503 (1975) (remarks of Sen. Cranston).

**16.** The Rehabilitation Act also requires the provision of a free appropriate public education at Willowglen to Lester. *See* 45 C.F.R. § 84.33 (1979). The Act applies to all defendants in this case. *See id.* §§ 84.2, 84.3(f).

education. The same is true of defendants' assertion that defendants Mandeville, Kempiners, Miller, Coler and Granzeier are not authorized by state law to provide plaintiffs with relief. Because they are involved with the education of handicapped children, they are required by the EHA to provide relief.

Second, defendants argue that Willowglen is at fault for its failure to be approved for funding before September, 1981, because Willowglen did not submit the proper budget forms. Assuming this is the case, Willowglen's default does not entitle defendants to deny Lester his right to a free appropriate public education. That right is absolutely guaranteed by federal law, there is nothing in the EHA authorizing defendants to nullify plaintiffs' rights under the EHA because of actions of Willowglen entirely beyond plaintiffs' control. If defendants disapproved of Willowglen, they had the right to place Lester elsewhere. But the EHA will not countenance defendants' decision to place Lester at Willowglen, and then turn around and refuse to pay for the placement because of Willowglen's alleged derelictions. If defendants were to place Lester at Willowglen, they would also have had to guarantee that the placement was at no cost to Lester's parents. By placing Lester at an unapproved facility, defendants abrogated this duty.

Finally, defendants contend that the Parks' fears that New Hope would close were unjustified, and that the decision to remove Lester from New Hope was the Parks' and not defendants'. Assuming this to be the case, it nevertheless is also the case that CBE agreed to the removal, and that DMHDD itself placed Lester at Willowglen. Had CBE and DMHDD disagreed with the Parks' decision, it could have required them to keep Lester at New Hope pending administrative review. *See* 20 U.S.C. § 1415(e)(3) (1976); *Stemple v. Board of Education,* 623 F.2d 893 (8th Cir. 1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). Defendants had no right to agree to the placement at

Willowglen, only to then refuse to pay the full costs, deciding in retrospect that the placement was a mistake. Once Lester had been placed at Willowglen, defendants had a duty, under 34 C.F.R. § 300.302 (1981) and 45 C.F.R. § 84.33(c)(3) (1979), to ensure that the placement was at no cost to Lester's parents.

For the foregoing reasons, plaintiffs have demonstrated a reasonable likelihood of success on the merits.[17]

## B

The second element necessary for the issuance of a preliminary injunction is an inadequate remedy at law or irreparable injury. Lester will be discharged from Willowglen if he does not obtain preliminary relief by March 25, 1982. If discharged, Lester will suffer injury due to the loss of continuity in his education, the sort of injury difficult to measure and compensate through an award of money damages after trial on the merits. During the period in which a new placement is sought for Lester, he will be deprived of any education at all. This sort of deprivation often works serious and irreparable damages on a handicapped child. *See Stanger v. Ambach,* 501 F.Supp. 1237, 1243 (S.D.N.Y.1980); *Armstrong v. Kline,* 476 F.Supp. 583, 596–600 (E.D.Pa. 1979), *aff'd in part and remanded sub nom. Battle v. Pennsylvania,* 629 F.2d 269 (3d Cir. 1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 781 (1981); *Stuart v. Nappi,* 443 F.Supp. 1235, 1240 (D.Del.1978). This sort of disruption is one of the evils the EHA seeks to avoid. *See* 121 Cong.Rec. 37025 (1975) (remarks of Rep. Perkins); 121 Cong.Rec. 37014 (1975) (remarks of Sen. Williams); *Anderson v. Thompson,* 658 F.2d 1205, 1212 (7th Cir. 1981); *Stemple v. Board of Education,* 623 F.2d 893, 898 (8th Cir. 1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

Defendants argue that there is no showing of irreparable injury, since Lester's parents may be able to afford to pay the

---

**17.** One court has specifically held that the EHA prohibits the imposition of a "responsible rela-

tive liability." *See In re Jones,* 98 Misc.2d 562, 414 N.Y.S.2d 258 (Fam.Ct.1979).

current bill, and later seek damages after trial on the merits. However, there is absolutely nothing in the record which supports this contention. To the contrary, it appears that Lester's father is currently unemployed and receiving workmen's compensation. Affidavit of Richard Parks ¶ 1.

Even if Lester's parents have an adequate remedy at law, Lester does not. Lester has his own right to a free appropriate public education, independent from that of his parents. Since Lester lacks the funds to pay the outstanding bill, the only way he can avoid discharge, short of obtaining preliminary relief here, is to obtain the funds from his parents. However, Lester has no way to ensure that he can obtain the funds. At most, Lester could sue his parents in state court in an attempt to compel them to provide the funds. It is far from clear that such a suit would be successful, and, in any event, it is virtually inconceivable that Lester could have a guardian appointed, retain separate counsel, institute suit and obtain relief prior to March 25. Because Lester has no adequate remedy at law and faces irreparable injury, he is entitled to preliminary relief.

### C

The harm to plaintiffs that is threatened by the discharge from Willowglen outweighs the harm to defendants caused by the granting of a preliminary injunction. Whereas Lester will be irreparably injured if he does not obtain relief and is discharged, the threatened injury to defendants is not irreparable. Should defendants prevail at trial on the merits, they can seek recovery of any amounts paid to Willowglen either directly from Willowglen, or from Lester's parents. Moreover, a preliminary injunction imposes no undue burden on defendants, since it requires defendants to do no more than provide Lester with the free education which is his right under federal law.

### D

Granting plaintiffs preliminary relief is in the public interest. When it enacted the EHA, Congress stated its conclusion that in the long run, the nation would be well-served by requiring states to assume the cost of providing handicapped children with a free appropriate education. Sen.Rep. *supra* at 9, 22, U.S.Code Cong. & Ad.News 1975, 1433, 1446; *Howard S. v. Friendswood Independent School District*, 454 F.Supp. 634, 641 (S.D.Tex.1978). A preliminary injunction would further this public interest.

### E

■ Plaintiffs have demonstrated the presence of the four elements necessary to obtain preliminary relief. Accordingly, we turn from the question of whether a preliminary injunction should issue, to the question of the type of preliminary relief plaintiffs should receive.

### IV

There is a serious question whether the relief plaintiffs seek is barred by the eleventh amendment.[18] While it has been clear since *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) that a federal court may enjoin state officials to conform their future conduct to the dictates of federal law, *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979), the relief plaintiffs seek is not entirely prospective. The injuries they seek to redress were occasioned by the past failures of defendants to meet fully Lester's expenses, and the eleventh amendment applies to awards of such retroactive relief, even if the complaint seeks to characterize the relief as equitable or prospective. *See Quern v. Jordan*, 440 U.S. at 337, 99 S.Ct. at 1143; *Edelman v. Jordan*, 415 U.S. 651, 668–69, 94

---

**18.** The eleventh amendment does not bar relief against defendant Love. As a municipal official, she does not enjoy the protection of the eleventh amendment. *See Lake Country Estates v. Tahoe Regional Planning Agency*, 440

U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979); *Monell v. Department of Social Services*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035 n.55, 56 L.Ed.2d 611 (1978).

S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). Nor do plaintiffs avoid the reach of the eleventh amendment by virtue of the fact that they have not sued the state itself, but only officers of the state, and have named them in their official and individual capacities. This action is really against the state, since it challenges the actions of defendants in their official capacities as officeholders, rather than any individual action taken by a given defendant. *See Scheur v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–1687, 40 L.Ed.2d 90 (1974); *Miener v. Missouri,* 673 F.2d 969, at 980–81 (8th Cir. 1982). Moreover, it is clear that any recovery plaintiffs obtain will be paid from the state treasury, so that the state is the real party in interest, and entitled to the protections of the eleventh amendment. *See Edelman v. Jordan,* 415 U.S. at 663, 668, 94 S.Ct. at 1355, 1358.

■ Unless the State of Illinois' eleventh amendment immunity has been abrogated in some way, plaintiffs may not obtain the relief to which they would otherwise be entitled. However, the EHA may very well have worked such an abrogation. It is well-settled that Congress, acting pursuant to its power to enforce the fourteenth amendment, *see* U.S. Const. amend. XIV, § 5, can abrogate the states' eleventh amendment immunity. *See Maher v. Gagne,* 448 U.S. 122, 132–33, 100 S.Ct. 2570, 2576, 65 L.Ed.2d 653 (1980); *Hutto v. Finney,* 437 U.S. 678, 679, 693, 98 S.Ct. 2565, 2568, 2574, 57 L.Ed.2d 522 (1978); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976).[19] Therefore, the question is whether Congress, in enacting the EHA, used its fourteenth amendment enforcement powers to abrogate the states' eleventh amendment immunity.

It is clear that Congress enacted the EHA pursuant to its power to enforce the fourteenth amendment. In its statement of findings, Congress stated that "it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children *in order to assure equal protection of the law.*" Pub. L.No. 94–142, 89 Stat. 775 (1975) (emphasis supplied).[20] The House Report states that "Congress has the responsibility to assure equal protection of the laws and thus to take action to assure that handicapped children have available to them appropriate educational services." House Rep.No.94–332, 94th Cong., 1st Sess. 19 (1975). One of the sponsors of the Act explained,

> The Constitution provides that all people shall be treated equally, but we know that, while all youngsters have an equal right to education, those who live with handicaps have not been accorded this right. This measure fulfills the promise of the Constitution that there shall be equality of education for all people, and that handicapped children no longer will be left out. 121 Cong.Rec. 37413 (1975) (remarks of Sen. Williams).

On the date of passage in the Senate, another sponsor said of the passage of EHA, "This is the day that handicapped children and their parents can point to and say that this Congress—their Congress—recognized as a matter of national policy, the equal protection under the law that they have always deserved." 121 Cong.Rec. 37411 (1975) (remarks of Sen. Stafford). To similar effect, *see* 121 Cong.Rec. 37417 (1975) (remarks of Sen. Schweiker); 121 Cong.Rec. 37417 (remarks of Sen. Javits); 121 Cong. Rec. 37029 (1975) (remarks of Rep. Michel); 121 Cong.Rec. 23,705 (1975) (remarks of Rep. Jeffords); 121 Cong.Rec. 37704 (1975)

---

**19.** For an explication of the basis of congressional power to abrogate eleventh amendment immunity, see Nowak, *The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments,* 75 Colum.L.Rev. 1413, 1422–41, 1460–64 (1975);

Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies about Federalism,* 89 Harv.L.Rev. 682, 694–96 (1976).

**20.** Congress was well aware of the significance of the last phrase. *See* Conf.Rep. at 28–29, U.S.Code Cong. & Ad.News 1975, 1482.

(remarks of Rep. Brademas).[21] Finally, the Senate Report forcefully indicates that Congress intended to create an enforceable equal protection right in the EHA.

> Parents of handicapped children all too frequently are not able to advocate the rights of their children because they have been erroneously led to believe that their children will not be able to lead meaningful lives. However, over the past few years, parents of handicapped children have begun to recognize that their children are being denied services which are guaranteed under the Constitution. It should not, however, be necessary for parents throughout the country to continue utilizing the courts to assure themselves a remedy. It is this Committee's belief that the Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity. It can no longer be the policy of the Government to merely establish an unenforceable goal requiring all children to be in school. S. 6 takes positive necessary steps to ensure that the rights of children and their families are protected. Sen. Rep., *supra* at 9, U.S.Code Cong. & Ad. News 1975, 1433.

*See also id.* at 13, 22–23, U.S.Code Cong. & Ad.News 1975, 1437, 1446–47.

In order to enforce the rights created by the EHA, Congress gave the parents or guardian of a handicapped child the right to file complaints regarding any matter relating to the provision of a free appropriate public education to their child against those responsible for the provision of the child's education. *See* 20 U.S.C. § 1415(b) (1976). If the administrative remedy does not prove satisfactory, the parents or guardian may bring a civil action in federal district court, and the court then "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(e)(2). The statute plainly empowers plaintiffs to sue state and local officials who fail to provide a free appropriate public education, and permits courts to grant relief subject only to the limitation of appropriateness.[22]

In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court held that Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 (1976) abrogated eleventh amendment immunity, since the statute was passed pursuant to Congress' power to enforce the fourteenth amendment, and "because the statute made explicit reference to the availability of a private action against state and local governments . . . ." *Quern v. Jordan*, 440 U.S. 332, 344, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979). The Court held that, while the statute contained no specific language abrogating eleventh amendment immunity as such, the statutory history which focused on the question of state liability demonstrated that Congress intended states to be subject to liability. *Id.* at 345. The Court did not require any explicit statement either in the statute or the legislative history that eleventh amendment immunity would be abrogated, since there was no such statement in the history or text of

21. Congressional intent to use the EHA as an enforcement mechanism for the fourteenth amendment rights of the handicapped can also be seen in the numerous statements that the EHA was designed to enforce various court decisions which had found a right to an appropriate public education for the handicapped under the fourteenth amendment. *See* House Rep.No.94–332, 94th Cong., 1st Sess. 3–5, 19 (1975); Sen.Rep. at 5–9, U.S.Code Cong. & Ad.News 1975, 1429–33; 121 Cong.Rec. 37030 (1975) (remarks of Rep. Mink); 121 Cong.Rec. 37027 (1975) (remarks of Rep. Gude); 121

Cong.Rec. 37025 (1975) (remarks of Rep. Brademas); 121 Cong.Rec. 37025 (1975) (remarks of Rep. Perkins); 121 Cong.Rec. 23,706–07 (1975) (remarks of Rep. Quie); 121 Cong. Rec. 23,703–04 (1975) (remarks of Rep. Brademas); 121 Cong.Rec. 19505 (1975) (remarks of Sen. Humphrey); 121 Cong.Rec. 19504 (1975) (remarks of Sen. Schweiker); 121 Cong.Rec. 19485 (1975) (remarks of Sen. Williams).

22. *See also* Part I, *supra.*

Title VII. *See* Field, *The Eleventh Amendment and other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States,* 126 U.Pa.L.Rev. 1203, 1248–52 (1978).[23]

The EHA, just like Title VII, explicitly authorizes actions against state and local governments. It creates a clear duty to provide a free appropriate public education on the part of state and local governments, gives parents the right to complain when that duty is breached, and to obtain review of their complaints in federal courts, which may then order "all appropriate relief." Just as in Title VII, there is a clear statutory history which focuses on the question of state liability, and determines that states should be required to assume the expense of providing a free appropriate public education, and that parents should have access to federal courts in order to air their complaints regarding failures to provide such an education. Congress has plenary power to enforce the fourteenth amendment by limiting the principle of sovereign immunity contained in the eleventh amendment, and imposing liability for damages on states. *Fitzpatrick v. Bitzer,* 427 U.S. at 456, 96 S.Ct. at 2671. What is required is a clear indication that Congress has considered the federalism interests protected by the eleventh amendment, and determined that they should give way. *See* Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies about Federalism,* 89 Harv.L.Rev. 682, 694–96 (1976). *See also* Nowak, *The Scope of Congressional Power to Create Causes of Action against State Governments and the History of the Eleventh and Fourteenth Amendments,* 75 Colum.L.Rev. 1413, 1441–42 (1975). That is present in the EHA. ▮ The legislative history of the EHA indicates that Congress carefully considered the role of the states in providing education for the handicapped, and determined that the requirements of equal protection demand that states assume the burden of educating the handicapped. Congress focused specifically on the question of state liability, and determined that states must assume these expenses by the dates specified in the Act, and that the handicapped ought to be able to judicially enforce this obligation by obtaining review of their complaints regarding the right to a free appropriate public education. Congress explicitly provided that states assume these costs, and that courts have all necessary power to enforce this obligation, subject only to the limitation that the relief ordered be appropriate. To hold that damages cannot be awarded even when "appropriate" under the Act would be to subvert the clear congressional intent to impose liability on states for "all appropriate relief." Congress, in the EHA, has directed states to assume the costs at issue here, through its power to enforce the fourteenth amendment.[24] We hold that the EHA abrogates the eleventh amendment immunity of the states.

Thus far, we have assumed that the abrogation of eleventh amendment immunity under the EHA can only be found if the evidence of congressional intent is clear and convincing. However, it may be that not even that much is required. The Court appears to have rejected the necessity for a "clear statement rule" and imposed a lesser standard for finding congressional intent to abrogate eleventh amendment immunity when Congress is acting under its power to enforce the fourteenth amendment. *See Hutto v. Finney,* 437 U.S. 678, 698 n.31, 98 S.Ct. 2565, 2577 n.31, 57 L.Ed.2d 522 (1978). This lesser standard makes sense. The justification for a "clear statement rule" is that courts should not lightly infer that

---

**23.** In fact, as Professor Field has noted, it would be utterly unrealistic to require such an explicit statement in a statute's legislative history before concluding that Congress intended to abrogate eleventh amendment immunity. *See id.* at 1272. *See generally Hutto v. Finney,*

437 U.S. 678, 696–97, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978).

**24.** Defendants do not challenge the EHA's constitutionality on the ground that it is not a proper exercise of congressional power under U.S. Const. amend. XIV, § 5.

Congress intends to infringe constitutional rights of the states, because of the respect the eleventh amendment demands for state sovereignty.

It would [ ] be surprising in the present case to infer that Congress deprived Missouri of her constitutional immunity without ... indicating in some way by clear language that the constitutional immunity was swept away. It is not easy to infer that Congress, in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under the Constitution. *Employees v. Department of Health and Welfare*, 411 U.S. 279, 285, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973).

Here, Congress is acting under the fourteenth amendment, and not its article I powers. When Congress acts under the fourteenth amendment, the protection of state sovereignty is of lesser force, since Congress cannot protect state sovereignty without limiting another constitutional interest, and because the fourteenth amendment itself is a limit on state sovereignty. "[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies ... are necessarily limited by the enforcement provisions of the Fourteenth Amendment." *Hutto v. Finney*, 437 U.S. at 698 n. 31, 98 S.Ct. at 2577 n.31 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. at 456, 96 S.Ct. at 2671). Under the relaxed standard for finding abrogation of immunity that is appropriate for this case, the conclusion that the EHA abrogates state immunity is even clearer.

■ Our conclusion is reinforced by the opinion in *Anderson v. Thompson*, 658 F.2d 1205 (7th Cir. 1981). There the court stated that the availability of damages under the EHA was solely a question of statutory construction, *see id.* at 1210, and that damages were recoverable for a failure to provide an appropriate educational placement for a handicapped child under certain circumstances, *see id.* at 1213–14. This was despite the presence of a state defendant.[25] Similarly, a number of other courts have treated the availability of damages under the EHA as solely a statutory matter, and found damages recoverable when authorized by the statute. *See, e.g., Town of Burlington v. Department of Education*, 655 F.2d 428, 432–34 (1st Cir. 1981); *Foster v. District of Columbia Board of Education*, 523 F.Supp. 1142, 1146 (D.D.C.1981); *Monahan v. Nebraska*, 491 F.Supp. 1074, 1094 (D.Neb.1980), *aff'd in part and rev'd in part on other grounds*, 645 F.2d 592 (8th Cir. 1981); *Boxall v. Sequoia Union High School District*, 464 F.Supp. 1104, 1112 (N.D.Cal. 1979).[26] It is true that there is substantial authority for the conclusion that the eleventh amendment does bar an award of damages under the EHA. *See Miener v. Missouri*, 673 F.2d 969, at 981–82 (8th Cir. 1982); *Tatro v. Texas*, 516 F.Supp. 968, 973

**25.** Had the court seen an eleventh amendment problem, it would have been required to raise the question on its own motion, since the matter is jurisdictional. *See Edelman v. Jordan*, 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–1363, 39 L.Ed.2d 662 (1974).

**26.** It is instructive to compare the EHA to 42 U.S.C. § 1983 (1976) which was held not to abrogate sovereign immunity in *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) and *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1973). Section 1983 does not refer explicitly to the imposition of liability on states, it refers only to persons acting under color of state law. Section 1983 does not contain "the threshold fact of congressional authorization to sue a class of defendants which literally included states," 415 U.S. at 672, 94 S.Ct. at 1360, and focuses only on the

liability of persons, which is insufficient to abrogate the immunity of states, *see* 440 U.S. at 342–45, 99 S.Ct. at 1145–1147. The history of § 1983 reinforces the conclusion that it was not intended to abrogate eleventh amendment immunity, *see Nowak, supra* at 1464–68. The EHA is much different. Its text and history focuses on the duties of states, not simply their officers. The statute creates a legal duty on the part of states, and makes the duty judicially enforceable. This is the critical difference between § 1983, *Edelman* and *Quern* on the one hand, and *Fitzpatrick* and the EHA on the other. *See* Field, *supra* at 1247–48.

It is also worth noting that in the EHA, Congress vested jurisdiction in the district courts "without regard to the amount in controversy." 20 U.S.C. § 1415(e)(4) (1976). This language seems to envision actions for damages.

(N.D.Tex.1981); *Riley v. Ambach*, 508 F.Supp. 1222, 1248 (E.D.N.Y.1980), *rev'd on other grounds*, 668 F.2d 635 (2nd Cir. 1981); *Hark v. School District of Philadelphia*, 505 F.Supp. 727, 731 (E.D.Pa.1980); *M. R. v. Milwaukee Public Schools*, 495 F.Supp. 864, 867 (E.D.Wi.1980); *Stubbs v. Kline*, 463 F.Supp. 110, 114–15 (W.D.Pa.1978); *see generally Ezratty v. Puerto Rico*, 648 F.2d 770, 776–77 (1st Cir. 1981) (dictum). However, these cases do not examine the interaction between the eleventh and fourteenth amendments and the EHA. All but *Miener* ignore the fourteenth amendment question completely. Because the EHA was enacted pursuant to Congress' power to enforce the fourteenth amendment, and because Congress provided that federal courts award "all appropriate relief," we conclude that the *Anderson* court was correct to state the issue solely as one of statutory construction: is the relief sought by plaintiffs "appropriate" under the Act? It is to that question that the court now turns.[27]

## V

As noted above, the relief plaintiffs seek is, in essence, an award of money damages. This raises the question of whether such relief is authorized by the EHA.

The statute is relatively silent on this question. It merely provides that the district court "shall grant such relief as it determines is appropriate." 20 U.S.C. § 1415(e)(2) (1976). The legislative history is also relatively silent on this question. The history does indicate, however, that judicial power to order relief is rather broad.

> The provisions of existing law with respect to judicial action are clarified and strengthened to assure that any party aggrieved by the findings and decision rendered in the due process hearing or the State educational agency review of such hearing shall have the right to bring

a civil action with respect to the original complaint and matters relating thereto. Such action may be brought in any State court of competent jurisdiction or in a district court of the United States and in any such action the court shall receive the records of the due process hearing (and where appropriate the records of the review of such hearing), shall hear additional evidence at the request of any party, shall make an independent decision based on a preponderance of the evidence and shall grant all appropriate relief. Conf. Rep. *supra* at 50, U.S.Code Cong. & Ad. News 1975, 1503.

To similar effect, *see* 121 Cong.Rec. 37416 (1975) (remarks of Sen. Williams). This is consistent with the long-standing rule that federal courts have broad power to shape relief.

> [W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done. *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (footnotes omitted).

In *Anderson v. Thompson*, the Seventh Circuit dealt with the nature of "appropriate relief" under the EHA. The court held that, in the case of an erroneous placement of a child in a facility not suited to her needs, damages are not appropriate relief. This result was followed in *Miener v. Missouri*, 673 F.2d 969, at 979–80 (8th Cir. 1982). However, the court did not erect an ironclad rule prohibiting damages in EHA cases; it acknowledged that damages were recoverable when necessary in order to protect rights under the Act. *See* 658 F.2d at

---

**27.** For the same reason that the eleventh amendment does not bar an award of damages under the EHA, it does bar an award under § 504 of the Rehabilitation Act. Neither the text nor the history of the Act evinces an intent to authorize an award of damages, nor is there evidence in the legislative history that Con-

gress focused on the question of state liability and determined that the federalism interests at stake should give way. Plaintiffs may obtain prospective relief only under § 504. *See Patton v. Dumpson*, 498 F.Supp. 933, 935 n.1 (S.D. N.Y.1980); *Stubbs v. Kline*, 463 F.Supp. 110 (W.D.Pa.1978).

1213–14. The factors mentioned in Anderson as being relevant to the determination whether damages are appropriate relief under the EHA indicate that plaintiffs should be able to recover damages in this case.

First, the *Anderson* court examined whether damages were necessary to eliminate the harm to the plaintiff caused by the defendants' violation of the Act. It noted that when a child is placed in a program unsuitable for his needs, the harm is eliminated by injunctive relief alone, requiring placement in a suitable program. 658 F.2d at 1210–11. Thus, injunctive relief results in the provision of a free appropriate public education. Here, however, the harm can only be eliminated by an award of damages. If Lester's bill is not paid, he will be discharged from Willowglen and deprived of education. As long as defendants do not pay the outstanding bill, the education Lester has received is not "free." Thus, while claims that the education provided a child is free but not appropriate can be adequately addressed by injunctive relief, claims that the education has been appropriate but not free can only be dealt with by an award of damages.

Second, in *Anderson* the court noted that Congress envisioned that the right to an appropriate education would be guaranteed by procedural safeguards and not awards of damages, and concluded that an award of damages was not part of the remedial mechanism set up by the Act. 658 F.2d at 1212. To use the words of the district court,

> Section 1415 is aimed at establishing procedures to obtain an appropriate placement and program for a child with exceptional needs and not at compensating the child for past deficiencies in the provision of a special education. *Anderson v. Thompson*, 495 F.Supp. 1256, 1269 (E.D. Wi.1980), *aff'd*, 658 F.2d 1205 (7th Cir. 1981).

However, with respect to a failure to provide a free education, the only remedial mechanism possible is an award of damages. The child's right to an appropriate placement is protected by remedial devices short of a damage award, and so there is no need to provide additional compensation.

However, in this case, an "appropriate placement and program" cannot be given to Lester unless defendants are ordered to pay his past bills so that he remains at Willowglen.

Third, the court noted that an award of damages would place undue burdens on states and localities. Diagnosis and placement of handicapped children into appropriate programs is a business fraught with uncertainty; the court noted that it would be improper to subject officials to liability for a decision which cannot be reviewed with certainty, and in a field where mistakes are inevitable, 658 F.2d at 1212, and the imposition of liability might deter school systems from experimenting with innovative diagnostic programs. *Id.* at 1213. Moreover, calculating a money figure for the damage caused because a child was not in a suitable program is difficult if not impossible, and where damages are not readily measurable, there is good reason to conclude that they should not be considered appropriate under the Act. *See Campbell v. Talladega County Board of Education*, 518 F.Supp. 47, 56–57 (N.D.Ala.1981). None of these factors is present in the instant case. The practices of defendants that are challenged here involve no uncertain medical judgments; only the reimbursement policies of defendants are challenged. No deterrence of innovative medical or rehabilitative procedures is threatened, since liability would not be imposed because of any medical or educational decision of the state. Plaintiffs only seek to require defendants to pay for a placement which all parties concede is appropriate.

█ In sum, *Anderson*, indicates that an award of damages is appropriate in this case. While the right to an appropriate placement can be protected simply by providing prospective injunctive relief, without getting into nice questions about whether liability should be imposed for difficult diagnostic decisions, and if so, how much, the right to a free education cannot be protected without ordering the state to pay for the education it provides. If Lester does not receive the relief he seeks, he will be discharged from Willowglen, and deprived of the free appropriate public education which

is his right under the Act. Accordingly, we follow those cases which have held that damages are recoverable under the EHA in situations similar to that presented here. *See, e.g., Town of Burlington v. Department of Education,* 655 F.2d 428, 432–34 (1st Cir. 1981); *Foster v. District of Columbia Board of Education,* 523 F.Supp. 1142, 1146 (D.D.C.1981) (dictum); *Monahan v. Nebraska,* 491 F.Supp. 1074, 1094 (D.Neb. 1980), *aff'd in part and rev'd in part on other grounds,* 645 F.2d 592 (8th Cir. 1981); *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104, 1112 (N.D.Cal. 1979).[28]

## VI

Plaintiffs have demonstrated· that they are entitled to preliminary relief. However, the court is cognizant that if plaintiffs obtain the preliminary relief that they seek, they will have obtained most of the relief they ultimately seek in this case prior to trial on the merits. Ordinarily, this is not a preferred result. Therefore, defendants will be preliminarily enjoined to provide Willowglen with sufficient assurances regarding the payment of the outstanding bill for services rendered to Lester Parks so that Willowglen will not discharge Lester Parks because of the unpaid bill. If defendants can provide assurances, short of actually paying the outstanding bill, sufficient to prevent Lester's discharge, then they will have complied with the preliminary injunction. However, if nothing short of payment in full will satisfy Willowglen, defendants will be required by the preliminary injunction to make the payment.

Accordingly, the judgment of this court is that plaintiffs' motion for a preliminary injunction should be and hereby is granted,

and that defendants should be and hereby are preliminarily enjoined to make assurances to Willowglen that they will pay the outstanding bill for services rendered to Lester Parks sufficient to prevent Willowglen from discharging Lester Parks. The injunction will issue without security.[29]

The preceding will serve as findings of fact and conclusions of law and the reasons for the decision for purposes of Fed.R.Civ.P. 52(a) and 65(d).

---

**28.** The only portion of the *Anderson* opinion which tends to argue that damages should not be awarded in a case such as this is the language indicating that damage actions might unduly burden state budgets. *See* 658 F.2d at 1212–13. However, reliance on this language proves too much. Congress required states to assume the cost of providing a free appropriate public education to every child, and imposed inflexible time deadlines for doing so. *See* Part III–A, *supra.* The EHA was designed to ensure that the goal was met. *See, e.g.,* Pub.L. No. 94–142, § 3(a), 89 Stat. 775 (1975); Sen.Rep. at

7–9, 1431–33; 121 Cong.Rec. 37025 (1975) (remarks of Rep. Perkins); 121 Cong.Rec. 37025 (1975) (remarks of Rep. Brademas). Damage relief in this case imposes no fiscal burden which Congress did not intend states to assume as of September 1, 1978. *See* 20 U.S.C. § 1412(2)(B) (1976).

**29.** Since we have granted plaintiffs the relief they seek on statutory grounds, we need not reach the constitutional arguments they advance.