Richard PARKS, Marilyn Parks, Lester Parks, by his parents and next friends, Richard Parks and Marilyn Parks, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Ivan PAVKOVIC, Director, Department of Mental Health and Developmental Disabilities, Edward Copeland, Chairman, Illinois State Board of Education, Ruth Love, Superintendent, Chicago Public Schools, Patricia Barger, Representative, Department of Mental Health and Developmental Disabilities, Robert Mandeville, Director, Bureau of the Budget, William Kempiners, Director, Department of Public Health, Jeffrey Miller, Director, Department of Public Aid, Gregory Coler, Director, Department of Children and Family Services, Robert Granzeier, Acting Director, Department of Vocational Rehabilitation, Donald Gill, State Superintendent of Education, individually and in their official capacities, Defendants.

No. 82 C 965.

United States District Court,
N.D. Illinois, E.D.

Feb. 28, 1983.

Mark C. Weber, Mandel Legal Aid Clinic, Chicago, Ill., for plaintiffs.

Robert John Connor, Ill. Dept. of Mental Health and Developmental Disabilities, Chicago, Ill., for Pavkovic and Barger.

Paul C. Millichap, Ill. Atty. Gen., for Copeland, Mandeville, Kempiners, Miller, Coler and Granzeier.

Patricia J. Whitten, Oak Park, Ill., for Love.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This is a disturbing case. Plaintiffs have brought to our attention one of the most blatant violations of federal law imaginable. It appears that the State of Illinois has been openly violating the rights of handicapped children. Defendants, instead of promptly moving to correct the problem, or even arguing that they have complied with federal law, defend this case almost entirely by finger-pointing. Each state and local agency involved in this case does little more than claim that it is not responsible for the plight of handicapped children in Illinois, and urges the court to pin the blame elsewhere. While this bureaucratic infighting rages, none of these public servants before the court seem concerned about finding a way to remedy the problem. That is a task that must, by default, fall on this court. We now undertake it.

## THE FACTS

Named plaintiff Lester Parks is a severely emotionally disturbed child in need of special education and related services. Because he is so severely disabled, he must be placed in a residential facility which can provide him with the intensive educational and support services that he needs. In early 1980, Lester's parents became fearful that the facility in which he then resided, New Hope Living and Learning Center, was in danger of closing. They sought help from the Chicago Board of Education ("CBE") and the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD") in finding an alternative placement for Lester.

In July, 1980, DMHDD placed Lester in Willowglen Academy, a residential treatment center in Milwaukee, Wisconsin. However, DMHDD did not pay for the cost of the ensuing treatment and special education that Lester received there. Eventually, Willowglen announced that it would discharge Lester on March 25, 1982 unless his outstanding bill was paid. In an effort to prevent the imminent discharge, Lester and his parents filed this suit on February 18, 1982. On March 19, this court ruled that defendants, the various state and local officials responsible for providing Lester with an education under state and federal law, had apparently breached their duty to provide Lester with a free appropriate public education, and issued a preliminary injunction requiring them to assure Willowglen that they would pay Lester's outstanding bill, so that it would not discharge him. *See Parks v. Pavkovic,* 536 F.Supp. 296 (N.D.Ill.1982).[1]

Pending before the court are plaintiffs' motions for class certification and partial summary judgment.

1. In our earlier opinion, we stated many of the facts and legal principles applicable to the pending motions. We will not repeat them here, but merely refer to the prior opinion where necessary.

2. *See generally* 34 C.F.R. § 300.300 (1981).

## THE MERITS

Before turning to the specific issues pending before the court, an examination of the merits of this lawsuit is necessary. The merits of the case provide the necessary perspective from which the more specific issues raised can be viewed.

"It is the purpose of this Act to assure that all handicapped children have available to them, within the periods specified ... a free appropriate public education." So goes the preamble to the Education for All Handicapped Children Act of 1975 ("EHA"), 20 U.S.C. § 1400(c) (Supp. V 1981). The Act goes on to provide that participating states such as Illinois must provide a free appropriate public education to all handicapped children ages three to eighteen by September 1, 1978, and to all children ages three to twenty-one by September 1, 1980. *Id.* § 1412(2)(B) (1976). Local educational agencies in participating states are also required to provide a free appropriate public education. *Id.* § 1414(a)(1)(C)(ii).[2]

The free appropriate public education guaranteed by the act includes both special education and related services provided at public expense. *See* 20 U.S.C. § 1401(18) (1976). "Related services" include all supportive services necessary to enable a handicapped child to benefit from special education. *Id.* § 1401(17). "Related services," if they include placement in a residential facility, must be free of charge.

If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302 (1981).[3]

Thus, the EHA unambiguously requires Illinois to provide an appropriate public ed-

3. None of the defendants challenge the validity of this or any other regulation of the United

ucation at no cost to the parents of handicapped children.[4] For reasons that escape us, however, Illinois chooses not to comply with this clear federal mandate. The Illinois Mental Health and Developmental Disabilities Code provides,

> Each recipient of services of the Department, and the estate of such recipient, is liable for the payment of sums representing charges for services to such recipient at a rate to be determined by the Department in accordance with this Act. If such recipient is unable to pay or if the estate of such recipient is insufficient, the responsible relatives are severally liable for the payment of such sums, or for the balance due in case less than the amount prescribed under this Act has been paid. The maximum services charged for each patient assessed against responsible relatives collectively may not exceed financial liability determined from income in accordance with the uniform schedule in Section 5–116 of this Act.

Ill.Rev.Stat. ch. 91½, § 5–105 (1981). The Act goes on to authorize DMHDD to assess the responsible relative liability created by the act to the responsible relatives, and creates a schedule for the assessment of costs based on the annual income of the recipient or his responsible relatives. *See id.* §§ 5–106 to 5–116.

Under this statutory scheme, DMHDD charges parents of handicapped children amounts equal to the responsible relative liability that they calculate for each recipient of services. In 1982, DMHDD made 207 assessments of responsible relative liability covering 478 recipients of services. Answers to Interrogatories by Defendant Pavkovic # 5. Lester's case is illustrative. His parents have been charged $100 per month since he was placed in Willowglen. This is despite the fact that Lester's father is unemployed. Plaintiffs have submitted affidavits from other parents of handicapped children who have had to pay similar charges. Thus, the free appropriate public education that is guaranteed by federal law is, in Illinois, anything but free.

## CLASS CERTIFICATION

In challenging the assessment of a responsible relative liability,[5] plaintiffs seek to have this case certified as a class action on behalf of

> All handicapped Illinois children between the ages of three and twenty-one and their parents who have been refused full funding for private special education placements as a result of any of the following Illinois State Board of Education ("ISBE"), Illinois Department of Mental

---

States Department of Education construing the EHA's requirements.

**4.** In addition to those authorities cited in our earlier opinion, *see Rabinowitz v. New Jersey State Bd. of Educ.,* 550 F.Supp. 481 (D.N.J. 1982); *Davis v. Maine Endwell Central School Dist.,* 542 F.Supp. 1257, 1258 (N.D.N.Y.1982); *Gary B. v. Cronin,* 542 F.Supp. 102, 109 (N.D. Ill.1980); *William S. v. Gill,* 536 F.Supp. 505, 510 (N.D.Ill.1982); *Parks v. Illinois Dep't of Mental Health & Dev. Disab.,* 110 Ill.App.3d 184, 186–88, 65 Ill.Dec. 695, 697–98, 441 N.E.2d 1209, 1211–12 (1982). The Rehabilitation Act, 29 U.S.C. § 794 (1976), also guarantees the provision of a free appropriate public education to handicapped children. *See Parks,* 536 F.Supp. at 304 n. 16. In dicta, the Supreme Court has acknowledged that the EHA requires that states not charge for the provision of an appropriate education to handicapped children. *See Board of Educ. v. Rowley,* —— U.S. ——, ——, 102 S.Ct. 3034, 3041, 73 L.Ed.2d 690 (1982) (the provision of a free appropriate pub-

lic education requires that "instruction and services be provided at public expense").

**5.** In our earlier opinion, we acknowledged that the EHA requires plaintiffs to exhaust their administrative remedies before seeking judicial relief, but held that plaintiffs had adequately attempted to exhaust and that further resort to administrative remedies would be futile. In addition to the authority relied on in the earlier opinion, *see Vander Malle v. Ambach,* 673 F.2d 49, 52 (2d Cir.1982); *Jose P. v. Ambach,* 669 F.2d 865, 869–70 (2d Cir.1982); *Gregg B. v. Board of Educ.,* 535 F.Supp. 1333, 1336–38 (E.D.N.Y.1982); *Ruth Anne M. v. Alvin Indep. School Dist.,* 532 F.Supp. 460, 463 (S.D.Tex. 1982). Since then, ISBE has refused to decide plaintiffs' administrative appeal, though federal law requires it to decide the appeal within 30 days. 34 C.F.R. § 300.512(c) (1981). Thus, we continue to believe that plaintiffs have done everything possible to exhaust their administrative remedies, and that further resort to those remedies would be futile.

Health and Developmental Disabilities ("DMHDD"), Governor's Purchased Care Review Board ("GPCRB"), and Chicago Board of Education policies and practices:

a. DMHDD policy not to pay a portion of special education costs designated as "responsible relative liability;"

b. ISBE policy not to pay the DMHDD-designated responsible relative liability;

c. ISBE policy not to assure that other state agencies pay the DMHDD-designated responsible relative liability;

d. Chicago Board of Education practice not to pay the DMHDD-designated responsible relative liability for the children within its jurisdiction.

There are four prerequisites to class certification.

(1) [T]he class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

This case satisfies the numerosity requirement. The parties appear to agree that the proposed class runs into the hundreds.

The case also satisfies the commonality requirement. The questions whether defendants fail to pay responsible relative liability and, if so, whether this violates federal law making judicial intervention appropriate are common to the class.

▮ The typicality inquiry examines the relationship between the representative party's claims and the class' claims. Certification is appropriate unless the named plaintiffs present unique claims personal to them which are likely to be a major focus of litigation. *See Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981); *Koos v. First National Bank,* 496 F.2d 1162, 1164 (7th Cir.1974). Defendants launch a number of arguments entirely irrelevant to Lester's claim in an attempt to show it is not "typical."

▮ First, defendants argue that Lester was not entitled to funding for his placement at Willowglen because his parents unilaterally placed him there. Plaintiffs allege to the contrary that DMHDD placed him there. Whichever is the truth is of little consequence, however. If DMHDD disagreed with Lester's parents' decision to send him to Willowglen, they could have refused to fund it, and insisted that he remain at New Hope pending administrative review. 20 U.S.C. § 1415(e)(2) (Supp. V 1981). Instead, DMHDD agreed to fund the placement at Willowglen, even before this suit was filed. The EHA will not countenance defendants' decision to accede to Lester's placement at Willowglen as long as they need not fully fund it. *See* 536 F.Supp. at 305. If DMHDD has initiated the administrative process for returning Lester to New Hope, this might be a different case.[6] However, that has not happened. It is little short of shameful for DMHDD to be content to leave Lester at Willowglen as long as it need not fully fund his placement.

▮ Second, defendants argue that Lester's claim is barred by res judicata. Lester successfully challenged DMHDD's imposition of a responsible relative liability during the period he was at New Hope in Illinois state court. *See Parks v. Illinois Department of Mental Health and Developmental Disabilities,* 110 Ill.App.3d 184, 65 Ill.Dec. 695, 441 N.E.2d 1209 (1982), from which leave to appeal was denied by the Illinois Supreme Court. However, defendants have never pleaded this defense as required by

---

**6.** Even then, however, the Act's status quo provision, requiring that handicapped children remain in their current placements pending administrative review of a proposed transfer, might require DMHDD to fund Willowglen pending a hearing. *See id.* Even when a child is in an unapproved placement, the EHA requires defendants to provide him with a free appropriate public education while they attempt to find him a suitable alternative placement. *See Vander Malle v. Ambach,* 673 F.2d 49, 52–53 (2d Cir.1982).

Fed.R.Civ.P. 8(c). Moreover, that judgment hardly precludes this action. The state court action was under the Illinois Administrative Review Act. As a result, the only relief plaintiffs could obtain was a reversal of the decision to impose a responsible relative liability for the placement at New Hope. The state court could not have provided prospective injunctive relief, or struck down the imposition of the liability for the Willowglen placement, which occurred long after the state action had been brought. *See* Ill.Rev.Stat. ch. 110, ¶ 275 (1981). Thus, plaintiffs' claims for prospective relief and reimbursement for costs assessed at periods other than while Lester was at New Hope could not have been litigated in the state action, and cannot be barred here. Plaintiffs' victory in state court means they cannot also recover the New Hope charges here, but they can recover the Willowglen charges and obtain injunctive relief against future Willowglen charges. These claims are fully typical of those of absent class members. *See Tonya K. v. Chicago Board of Education,* 551 F.Supp. 1107, 1111 (N.D. Ill.1982). Whatever funds plaintiffs recovered in state court that cannot be recovered here should be easily determinable and not a major focus of this litigation.[7]

■ The final prerequisite to certification involves the adequacy of the named plaintiffs' representation. The named plaintiffs' attorney must be qualified to conduct the litigation, and the plaintiff must not have interests antagonistic to those of the class. *Susman v. Lincoln American Corp.,* 561 F.2d 86, 90 (7th Cir. 1977). The named plaintiffs are represented by the venerable Edwin F. Mandel Clinic University of Chicago Law School which has an outstanding track record, and their attorney has pursued this and similar litigation in a loyal and competent manner. The

named plaintiffs have no interests antagonistic to those of the class. They seek to realize the promise of a free appropriate public education, just as do all other class members.

■ Having satisfied the prerequisites, plaintiffs seek certification under Fed.R. Civ.P. 23(b)(2), which applies where defendants have acted on grounds generally applicable to the class making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.

Defendants do not dispute that if plaintiffs prevail, final injunctive relief and corresponding declaratory relief would be appropriate. Their only argument is that the class definition is overbroad in that it overlaps with a class of emotionally disturbed children which obtained relief from Chief Judge McGarr of this court in *Gary B. v. Cronin,* 542 F.Supp. 102 (N.D.Ill.1980). However, defendants never explain why the alleged overlap means they have not acted on grounds generally applicable to the class. It appears that the responsible relative liability is imposed on all class members, whether or not they were also in the *Gary B.* class. Defendants never argue otherwise. Nor do they argue that *Gary B.* classmembers' claims are barred by res judicata or otherwise. They do argue that relief here would be "inconsistent" with the *Gary B.* decree but again do not explain how. In fact, *Gary B.* ordered defendants to provide certain "related services" free of charge, which is entirely consistent with the relief plaintiffs seek here.

The motion for class certification should be and hereby is granted.

## PARTIAL SUMMARY JUDGMENT

In their motion for partial summary judgment, plaintiffs contend that

---

7. Defendants also claim Willowglen is not eligible for funding because it is not a state-approved institution, it did not submit the proper forms, CBE did not submit the proper forms and a variety of similar bureaucratic reasons, none of which involve any faults on the part of Lester or his parents. As long as Lester remains a handicapped child entitled to statutory

protection, defendants are not permitted to leave Lester in an unfunded placement. While Willowglen, CBE or others may have made mistakes, "that circumstance does not permit the State to disclaim its statutory responsibilities," *Vander Malle v. Ambach,* 673 F.2d 49, 52 (2d Cir.1982).

DMHDD's assessment of a responsible relative liability violates federal law, and specifically the duty to provide a free appropriate public education.

The only defendant that even attempts to defend the responsible relative liability under the Illinois Mental Health and Developmental Disabilities Code is DMHDD.

■ First, DMHDD argues that it is not bound by the EHA. This argument is frivolous. The Act applies to all state agencies "involved in the education of handicapped children." 34 C.F.R. § 300.2(b) (1981). DMHDD surely is involved in the education of handicapped children; it pays for the education of Lester and hundreds of handicapped children like him each year. This argument was made by DMHDD and rejected by us in our earlier opinion, see 536 F.Supp. at 304, and by the Illinois Appellate Court in the New Hope case, see 110 Ill. App.3d at 188, 65 Ill.Dec. at 698, 441 N.E.2d at 1212.[8] It fares no better the third time around.

■ Second, DMHDD argues that the EHA is unconstitutional because it conflicts with the fourteenth amendment.[9] DMHDD argues that due process requires it to place handicapped children in the least restrictive environment possible.[10] Imposing a responsible relative liability is necessary, DMHDD argues, to give parents an incentive not to seek overly restrictive care for their children. Accordingly, the Illinois statutory scheme is necessary to enable the state to fulfill its obligations under the fourteenth amendment.

This argument, too, is frivolous. Defendants nowhere explain why parents will always opt for the most restrictive placement.

In fact, the amount of the responsible relative liability assessed hinges on the parents' income, not on the restrictiveness of the placement. Thus, the Illinois scheme does not create a financial incentive to avoid restrictive placements. Neither does the EHA create an incentive to seek restrictive placement. The cost to parents remains zero no matter where the child is placed. Moreover, the Act explicitly requires that placements be made in the least restrictive environment. See *Kruelle v. New Castle County School District,* 642 F.2d 687, 695 (3d Cir.1981); *Department of Education v. Katherine D.,* 531 F.Supp. 517, 525–27 (D.Haw.1982); *Kruelle v. Biggs,* 489 F.Supp. 169, 174 (D.Del.1980), *aff'd sub nom. Kruelle v. New Castle County School District,* 642 F.2d 687 (3d Cir.1981); 20 U.S.C. § 1412(5) (1976).[11]

■ In short, once it is established that the EHA is valid and applicable, there is little question but that Illinois has violated it. The class we have certified consists of handicapped children clearly entitled to an education at no cost to their parents under federal law. The Illinois statutory scheme by which a "responsible relative liability" is assessed for what no one disputes are special education and related services within the meaning of the EHA is in the conflict with federal law, and is invalid under the supremacy clause. The Illinois Appellate Court has already held the statutory scheme by which DMHDD imposes a responsible relative liability unconstitutional, relying in large part on our earlier opinion. See *Parks v. Illinois Department of Mental Health and Developmental Disabilities,* 110 Ill.App.3d 184, 65 Ill.Dec. 695, 441 N.E.2d

---

**8.** *See also Jose P. v. Ambach,* 669 F.2d 865, 870–71 (2d Cir.1982). The federal regulations construing the EHA explicitly state that the Act applies to "Departments of Mental Health." 34 C.F.R. § 300.2(b)(3) (1981).

**9.** Were the question a close one, we would have to certify it to the Attorney General of the United States under 28 U.S.C. § 2403 (1976). However, it is not.

**10.** It is far from clear that due process requires this. In its first encounter with this issue, the

Supreme Court held only that due process prohibits restrictions on the freedom of the handicapped which are not reasonably related to their safety, training, or other legitimate nonpunitive governmental interests. *See Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

**11.** *See also Board of Educ. v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).

1209 (1982). We agree and hereby grant plaintiffs' motion for partial summary judgment.

## WHO IS LIABLE?

Defendants devote most of their memoranda to the arguing about which of them should be held liable for the failure of Illinois to comply with federal law. DMHDD contends that the EHA places the responsibility for compliance on ISBE, and that since only ISBE receives federal funds under the EHA, only ISBE should be held liable. ISBE claims that since it is DMHDD that placed Lester and most other persons for whom a responsible relative liability is assessed, and since it is DMHDD that actually assesses the responsible relative liability, DMHDD alone should be held responsible. GPCRB claims that it is not responsible, since all it does is set rates at which providers of special education and related services are paid. CBE argues that there is nothing in the record showing that it has a policy of not paying the responsible relative liability, so no relief should be entered against it.

All this finger pointing makes for a somewhat sorry spectacle. One point remains clear, however: the imposition of a responsible relative liability is violative of plaintiffs' federal civil rights. From this fact follows a corollary: where there is a right, there is a remedy. Plaintiffs' civil rights cannot be permitted to slip between the cracks simply because the state of Illinois has apportioned liability in a way that does not focus blame on a single agency.

▮▮▮▮ ISBE, as the state educational agency,[12] is clearly responsible for Illinois' failure to comply with federal law. Under the EHA, it is responsible for ensuring compliance with the requirements of the Act. *See* 20 U.S.C. § 1412(6) (1976); 34 C.F.R. § 300.600. The ultimate responsibility is placed on ISBE precisely to avoid an abdication of responsibility by other state agencies such as has occurred here. *See id.* Comment.[13] ISBE may not rely on other agencies, alleged derelictions, for the ultimate responsibility for assuring compliance with the EHA lies with it and it alone. DMHDD's answers to interrogatories establish that hundreds of families of handicapped children have been assessed responsible relative liabilities for services covered by the Act. No contention is made the ISBE or any other state agency paid these assessments. Thus, the education these children have received was not "free," and as a result, ISBE has breached the affirmative obligation placed on it by federal law to ensure that Illinois provides a free appropriate public education to handicapped children.

DMHDD is also liable. We have already held that the EHA applies to it. The fact that DMHDD receives no federal funds under the Act is no defense; 34 C.F.R. § 300.2(b) (1981) explicitly states that the Act applies to DMHDD. The comment continues,

> The requirements of this part are binding on each public agency that has direct or delegated authority to provide special education and related services in a State that receives funds under Part B of the Act, regardless of whether that agency is receiving funds under Part B.

*Id.* Comment. If DMHDD requires financial assistance to meet its obligations from ISBE, which does receive federal funds, a

---

**12.** ISBE clearly qualifies as the state educational agency. *See* 20 U.S.C. § 1401(7) (1976).

**13.** The comment is instructive. Referring to the rule that that state agency must bear ultimate responsibility, it states, "Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped children, sources of funding, and type of services delivered.... [T]he responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency." *Id.* (quoting Sen.Rep. No. 168, 94th Cong., 1st Sess. 24 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1448).

cost sharing arrangement may be used. *See id.* § 300.301(a).[14]

GPCRB is also liable. Under state law, it must approve costs of and facilities for special education, and establish guidelines for coordination of financial assistance to assure that no handicapped child is denied the benefits of any state program. *See* Ill.Rev. Stat. ch. 122, ¶ 14–7.02 (1981). However, it remains bound by the provisions of the Mental Health and Developmental Disabilities Code providing for a responsible relative liability. *See id.* Thus, it too is involved in the education of handicapped children within the meaning of 34 C.F.R. § 300.2(b) (1981) and is part of the structure by which a responsible relative liability is assessed.

CBE, in its answer to the amended complaint, denies the existence of a policy of not paying the responsible relative liability assessed by DMHDD. However, it carefully refrains from affirmatively stating that it does pay the assessments. Nor does it submit affidavits or other evidentiary materials in support of its denial.

In Lester's case, CBE did refuse to pay the assessment. Administrative Record 514. CBE concedes as much. Yet, presumably the CBE hearing officer's ruling was not an arbitrary or freakish happenstance, but the product of some policy or practice. At least we think the facts of Lester's case

raise an inference that CBE does not customarily pay the liability.[15]

Moreover, CBE takes the position that it is "precluded" from making any payments for the education of handicapped children which are not authorized by Ill.Rev.Stat. ch. 122, ¶ 14–7.02 (1981). *See* Certain Defendant's Responses to Plaintiff's Motion for Partial Summary Judgment at 2. Yet, the final paragraph of that statute incorporates the provisions of the Mental Health and Developmental Disabilities Code which state that the responsible relatives are liable for a portion of costs. Thus, by CBE's own reasoning, it is precluded from paying DMHDD-assessed responsible relative liabilities. In fact, we have examined the entire School Code in an attempt to find some statutory authority for CBE to pay responsible relative liabilities, and have found none. It appears that Illinois law does not permit CBE to pay these costs.[16]

In light of the preceding, and CBE's failure to submit any evidentiary material indicating that it pays the DMHDD assessments, we think that a fair inference has been raised that CBE does not pay the assessments which has not been rebutted by specific facts supported by affidavit or otherwise as required by Fed.R.Civ.P. 56(e). Plaintiffs are entitled to partial summary judgment against CBE.[17]

**14.** DMHDD and GPCRB rely on *Kruelle v. Biggs,* 489 F.Supp. 167, 174 (D.Del.1980), *aff'd sub nom. Kruelle v. New Castle County School Dist.,* 642 F.2d 687 (3d Cir.1981) in support of their contention that only ISBE is liable. There, the court imposed liability on the state educational agency. However, the court nowhere stated that other state agencies involved in the education of handicapped children were not liable. All it did was place ultimate responsibility for compliance with federal law on the state educational agency, as the appellate opinion in the case made clear. *See* 642 F.2d at 696–97. The same may be said of defendants' reliance on *North v. District of Columbia Bd. of Educ.,* 471 F.Supp. 136, 139–40 (D.D.C.1979). In any event, these defendants do not attack the validity of 34 C.F.R. § 300.2(b) (1981), which explicitly applies the EHA to them.

**15.** Moreover, DMHDD's answers to interrogatories state that a responsible relative liability

is assessed and placements are not fully funded even where the child receives "LEA" (local educational agency) funds.

**16.** Thus, even if CBE wishes to pay the assessments, it may require the aid of a federal injunction to secure it against the risk that its payments are not proper under state law.

**17.** We are disturbed that CBE has denied the existence of a policy of not paying the assessments, yet failed to affirmatively state that it does pay the assessments and submit affidavits in support of the claim. If CBE actually does pay the assessments, it should be easy for it to obtain affidavits to that effect. If it does, we will gladly reconsider our ruling. However, we are disinclined to force plaintiffs to trial unless and until CBE does make an affirmative statement of its policy, supported in the manner required by rule 56.

In sum, all the defendants are obliged to provide plaintiffs with a free appropriate public education. That duty has been breached, and all are liable. We need not, at this juncture, sort out exactly which agency or agencies will pay the assessments or how this will be done.[18] It is enough that we assign to ISBE the ultimate responsibility for coordinating compliance with federal law in the final decree that we issue, as the Third Circuit has recognized.

> By placing the burden for coordinating efforts and financial arrangements for [plaintiffs'] education on the State Board of Education, the trial judge was both reflecting legislative intent and appropriately observing the limits of his institutional role. Rather than rigidly prescribe for the state how various local and state agencies should contribute to the provision of a free education for [plaintiffs], the federal court left such interactions to the discretion of the state officials involved.

*Kruelle v. New Castle County School District,* 642 F.2d 687, 697 (3d Cir.1981).

All defendants are liable and will be bound by our final decree. We will dictate no specific mode of compliance to them, but merely order ISBE to assume ultimate responsibility for developing a plan that complies with federal law.

## APPROPRIATE RELIEF

There is no dispute that if defendants are liable, final injunctive relief against the assessment of a responsible relative liability would be appropriate.

 In our earlier opinion, we concluded that plaintiffs may also obtain reimbursement of past charges assessed against them,

since the EHA abrogates defendants' eleventh amendment immunity. *See* 536 F.Supp. at 306–11. *Accord, Department of Education v. Katherine D.,* 531 F.Supp. 517, 528–31 (D.Haw.1982). *Contra, Matthews v. Ambach,* 552 F.Supp. 1273, 1280–81 (W.D.N.Y.1982).

In their motion to reconsider the granting of a preliminary injunction, the state defendants argued that *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) is to the contrary. They relied on dicta in the case, specifically two footnotes, *id.* at 3042 n. 11, 3049 n. 26. In those footnotes the Court rejects a claim that the EHA can be read to impose a duty on the states to maximize the educational potential of handicapped children because Congress, "when exercising its spending power," can impose no burden on the states unless it does not unambiguously. Defendants contend that this demonstrates that the Act was passed pursuant to Congress' article I spending power, rather than its power to enforce the fourteenth amendment. A finding that the Act was passed pursuant to U.S. Const. amend. XIV, § 5 was a necessary predicate to our conclusion that the Act abrogates the states' eleventh amendment immunity from suits for damages. *See* 536 F.Supp. at 306–07.

In making this argument, state defendants [19] overlook the context of the footnotes on which they rely. These footnotes respond to a claim that the Act requires that each handicapped child's educational potential be maximized. The Court noted that such a claim could not be based on the fourteenth amendment, since the cases construing that constitutional provision on

---

**18.** *Cf. United States v. Board of School Commissioners,* 677 F.2d 1185, 1194 (7th Cir.) (Posner, J., dissenting) ("[R]ather than get into the tangled and recriminatory business of who shall pay for this court-ordered busing, we should say: 'This litigation ended, at long last, when the district court's busing order was upheld .... Let the State of Indiana worry about who shall bear the costs of complying with the order. It is not a matter for the federal courts unless the state should devise a method of financing that discriminates against black peo-

ple who are the intended beneficiaries of the order. Other than in a purely technical sense there is no federal question before us today.' "), *cert. denied,* —— U.S. ——, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982).

**19.** CBE, through defendant Love, does not make this argument, presumably because it does not enjoy an eleventh amendment immunity under any circumstances. *See* 536 F.Supp. at 306 n. 18.

which Congress relied in writing the Act had not recognized a right to "maximized" potential. *See* 102 S.Ct. at 3043–44 & n. 15, 3047–48. Thus, to the extent that Ms. Rowley sought to go further and assert such a right, it could only be based on the spending power. That is why the Court referred to her claim as based on an article I power. However, when the Court referred to the core right to a free appropriate public education, it did recognize that that statutory right had its genesis in the congressional power to enforce the fourteenth amendment. The Court recognized that the cases which established a fourteenth amendment right to education on behalf of handicapped children and "the principles that they established are the principles which, to a significant extent, guided the drafters of the Act." *Id.* at 3044. The Court acknowledged that the Act was designed to effectuate the principles of these constitutionally-based cases. *See id.* at 3043–44 & n. 18. The Court went on to observe, "Respondents and the United States correctly note that Congress sought 'to provide assistance to the States in carrying out their responsibilities under . . . the Constitution of the United States *to provide equal protection of the laws.*'" *Id.* at 3046–47 (emphasis supplied) (quoting Sen.Rep. No. 168, 94th Cong., 1st Sess. 13 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1437 [20]). The Court characterized the Act as a "legislative conception of the requirements of equal protection," *id.* at 3047, designed "to provide a 'basic floor of opportunity' consistent with equal protection," *id.* The Court concluded that the Act and its history reflects Congress' belief that equal protection required that handicapped children receive meaningful access to a free appropriate public education, though no more. *Id.* at 3047–48. *See also id.* at 3053 (Blackmun, J., concurring in the judgment).

Here, plaintiffs do not seek to have the educational potential of handicapped children "maximized," but only to obtain access to the "free" education guaranteed by the Act. Thus, what plaintiffs seek is not the sort of claim that can only be based on the spending power, but rather is the "free" education which *Rowley* acknowledges is itself a "legislative conception of the requirements of equal protection." As such, plaintiffs' claims arise from Congress' efforts to enforce the fourteenth amendment. *Rowley* confirms our view that the Act was passed pursuant to the congressional power to enforce the fourteenth amendment.

As we noted in our earlier opinion, the EHA requires that we award plaintiffs "all appropriate relief." *See* 536 F.Supp. at 311. We concluded that an order requiring defendants to pay costs previously assessed would constitute appropriate relief. *See id.* at 312–13. We see no reason to depart from that conclusion. Plaintiffs do not seek unliquidated sums as "tort damages" caused by defendants' conduct.[21] Rather, all they seek is the amounts assessed against them as responsible relative liabilities. Unless defendants reimburse them for these amounts, there is no way plaintiffs' right to a free appropriate public education can ever be vindicated. We conclude that an order requiring defendants to reimburse plaintiffs for costs they have incurred since February 18, 1977 would constitute appropriate relief in this case.[22]

---

**20.** We also cited this passage from the Senate Report in our earlier opinion. *See* 536 F.Supp. at 308.

**21.** If they did, this would be a different case. Tort damages can never be appropriate relief. *See Anderson v. Thompson,* 658 F.2d 1205, 1213 & n. 12 (7th Cir.1981); *William S. v. Gill,* 536 F.Supp. 505, 512 (N.D.Ill.1982); *Gregg B. v. Board of Educ.,* 535 F.Supp. 1333, 1339 (E.D.N.Y.1982); *Ruth Anne M. v. Alvin Indep. School Dist.,* 532 F.Supp. 460, 465 (S.D.Tex.1982).

**22.** The parties appear to agree that February 18, 1977 is an appropriate date to use as the starting date for a reimbursement order. In addition to those authorities contained in our earlier opinion which support entry of a reimbursement order, *see Matthews v. Ambach,* 552 F.Supp. 1273 (W.D.N.Y.1982); *Calhoun v. Illinois State Bd. of Educ.,* 550 F.Supp. 796, 803 (N.D.Ill.1982); *William S. v. Gill,* 536 F.Supp. 505, 511–12 (N.D.Ill.1982); *Gregg B. v. Board of Educ.,* 535 F.Supp. 1333, 1338–39 (E.D.N.Y.1982); *Department of Educ. v. Katherine D.,* 531 F.Supp. 517, 528–31 (D.Haw.1982). How-

**1292**

## CONCLUSION

To summarize, plaintiffs' motions for class certification and partial summary judgment are granted. Defendants' policies of leaving unpaid responsible relative liability assessments violates federal law. Defendants will be permanently enjoined from leaving these assessments unpaid in the future. Defendants will also be permanently enjoined to calculate and pay to each family in the plaintiff class, or, where the family has not paid the assessment, to the provider who has been left unpaid, all responsible relative liability amounts charged since February 18, 1977. Plaintiffs are to submit a draft decree on notice to defendants.[23]

ever, children ages 3–5 and 18–21 should only receive relief for costs incurred during periods when children of these ages were guaranteed a free education under state law. *See* 20 U.S.C. § 1412(2)(B) (Supp. V 1981).

**23.** As we stated earlier, the draft decree should apply to all defendants, but should place on ISBE the ultimate responsibility for devising a mechanism to coordinate compliance with the decree. However, the decree should do no more than order defendants to pay the responsible relative liability. The specific method by which payments are made should be left to defendants' discretion, at least in the first instance.

At the time we enter the permanent injunction, we will address the question whether the judgment we enter should be made final under Fed.R.Civ.P. 54(b).