Richard PARKS, Marilyn Parks, and Lester Parks by his parents and next friends, Richard Parks and Marilyn Parks; on their own behalf, and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

Ivan PAVKOVIC, Director, Department of Mental Health and Developmental Disabilities, et al., Defendants-Appellants.

Nos. 83–2391, 83–2448 and 83–2567.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1984.

Decided Feb. 5, 1985.

As Corrected Feb. 13, 1985.

Patricia Rosen, Deputy Atty. Gen., Robert J. Krajcir, Board of Education of Chicago, Chicago, Ill., for defendants-appellants.

Mark C. Weber, Edwin F. Mandel Legal Aid Clinic, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, and BAUER and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This is a class action by handicapped children and their parents, under the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1400 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, against the directors of various Illinois state agencies. The state—as we shall refer to the defendants collectively, because they are sued in their official capacities—appeals from the district judge's grant of injunctive and monetary

relief to the class represented by the plaintiffs named in the complaint (Lester Parks and his parents).

Lester Parks is now 19 years old, but because of various (nonphysical) afflictions such as autism and mental retardation, he functions on the level of a 3–6 year old. He is indisputably a handicapped child within the meaning of the Education for All Handicapped Children Act, which requires participating states such as Illinois to offer all handicapped children between the ages of 3 and 21 (with immaterial exceptions) "a free appropriate public education." 20 U.S.C. § 1412(1); see generally *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The term includes both "special education and related services," 20 U.S.C. § 1401(18), the former meaning "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including ... instruction in hospitals and institutions," § 1401(16); the latter meaning "transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education," § 1401(17).

In 1980 Lester was in a private institution called New Hope Living and Learning Center. The state reimbursed his parents for all of the instructional and living expenses charged by New Hope except for $100 of his monthly living expenses. (We shall use the term "living expenses" to denote room and board, clothing, and other such noninstructional expenses, whether incurred in private residential institutions or private day schools.) The state defends the deduction on the ground that it had placed Lester in New Hope not because he had special educational needs but because he had a "developmental disability," meaning "a disability which is attributable to: (a) mental retardation, cerebral palsy, epilepsy or autism; or to (b) any other condition which results in impairment similar to that caused by mental retardation and which requires services similar to those required by mentally retarded persons." Ill.Rev. Stat.1981, ch. 91½, ¶ 1–106. Illinois law requires the parents of a child who is placed in a private facility to pay a maximum of $100 a month toward the costs of the facility (the maximum is not reached until the family has an annual income of $15,600) if the child was placed there pursuant to a determination by the state that he required such placement because he was developmentally disabled rather than because he needed a special education within the meaning of the Education for All Handicapped Children Act. See Ill.Rev.Stat. 1981, ch. 91½, ¶ 5–116; Ill.Admin.Code, ch. I, § 226.420(c).

Lester's parents complained to the responsible state agency, and on appeal to the Illinois state courts won a judgment requiring the state to pay New Hope's bills in full. See *Parks v. Illinois Dept. of Mental Health & Developmental Disabilities*, 110 Ill.App.3d 184, 65 Ill.Dec. 695, 441 N.E.2d 1209 (1982). That litigation finally ended on February 1, 1983, when the Illinois Supreme Court denied the state leave to appeal. Meanwhile Lester had been moved in 1980 to another private institution, Willowglen Academy, and again his parents were required to pay $100 a month toward his living expenses and again they complained to the state agency. A hearing officer ordered the state to pay Willowglen's future bills in full but did not order it to reimburse the Parkses for their unpaid Willowglen bills, which had mounted up above $2,000. The Parkses appealed the hearing officer's decision to the next level of administrative review. When the appeal was not decided within the time required by federal law, the Parkses, having thus exhausted their administrative remedies, and facing a discharge notice from Willowglen, brought this suit in federal district court early in 1982 under 20 U.S.C. § 1415(e)(2). This section of the Education for All Handicapped Children Act autho-

rizes anyone aggrieved by a decision made by a state in administering the Act to bring a civil action in state or federal court after exhausting his state administrative remedies, and directs the court to "grant such relief as the court determines is appropriate." The complaint alleged that the state was violating both the Education for All Handicapped Children Act and section 504 of the Rehabilitation Act by refusing to pay for Lester's living expenses. The complaint asked for a preliminary injunction ordering the state to pay the accumulated bill from Willowglen so that Lester would not be expelled before trial, and a permanent injunction forbidding the state to deduct any part of Lester's living expenses in the future (till he reaches 21).

The district court granted the preliminary injunction in March 1982, 536 F.Supp. 296, 313 (N.D.Ill.1982), and the state complied with the injunction. In February 1983 the district court certified the Parkses' suit as a class action on behalf of all handicapped children (apparently some 600 in all) whose living expenses (up to $100 a month) the state requires the parents to pay on the ground that the children have been institutionalized because they are developmentally disabled rather than because they need special education. 557 F.Supp. 1280 (N.D.Ill.1983). A few months later the court permanently enjoined the state from requiring such payments and also entered a purported final judgment under Rule 54(b) of the Federal Rules of Civil Procedure ordering the state to reimburse the class members for living expenses that the state had refused to defray since 1978, when the pertinent provisions of the Education for All Handicapped Children Act took effect. The court did not compute the amount of reimbursement due; we were told at argument that the total is between $1.5 million and $3 million.

The state appeals from both the permanent injunction and the order regarding reimbursement. We must first decide whether we have appellate jurisdiction. We shall begin with the order to reimburse living expenses; as will appear, the appealability of the permanent injunction is not

problematic, even if that injunction is not itself a final order.

■ A district judge does not have carte blanche to certify an order for an immediate appeal under Rule 54(b). The order must finally dispose of a separate claim or a separate party. Normally an order that merely decides liability and leaves the determination of damages to future proceedings does not finally dispose of any claim; it is just a preliminary ruling on the plaintiff's damage claim. E.g., *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976); *Freeman United Coal Mining Co. v. Director, Office of Workers' Compensation Programs*, 721 F.2d 629, 630 (7th Cir. 1983); *Weiss v. York Hospital*, 745 F.2d 786, 802–03 (3d Cir.1984); *Garzaro v. University of Puerto Rico*, 575 F.2d 335, 337 (1st Cir.1978); cf. *Harris v. Goldblatt Bros., Inc.*, 659 F.2d 784, 786 (7th Cir.1981). But if the determination of damages will be mechanical and uncontroversial, so that the issues the defendant wants to appeal before that determination is made are very unlikely to be mooted or altered by it—in legal jargon, if only a "ministerial" task remains for the district court to perform—then immediate appeal is allowed. See *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 and n. 5, 100 S.Ct. 745, 749 and n. 5, 62 L.Ed.2d 676 (1980); *Gulf Refining Co. v. United States*, 269 U.S. 125, 136, 46 S.Ct. 52, 53, 70 L.Ed. 195 (1925); *Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820, 826 (7th Cir.1984); *Freeman United Coal Mining Co. v. Director, Office of Workers' Compensation Programs, supra*, 721 F.2d at 631; *United States v. Hughes*, 585 F.2d 284, 286 (7th Cir.1978); *St. Louis Shipbuilding & Steel Co. v. Casteel*, 583 F.2d 876 and n. 1 (8th Cir.1978); *Love v. Pullman Co.*, 569 F.2d 1074, 1076 (10th Cir. 1978); *Hattersley v. Bollt*, 512 F.2d 209, 213–14 (3d Cir.1975); cf. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 216 n. 8, 97 S.Ct. 1782, 1789 n. 8, 52 L.Ed.2d 261 (1977). For if the further proceedings in the trial court are quite unlikely to make the appeal moot or even affect the issues on appeal,

there is no reason to delay the appeal while they are resolved; and the delay may be a source of cost.

The line between the ministerial and the substantial is a very dim one, but we think this case falls on the ministerial side, if barely. It is not like *Strey v. Hunt Int'l Resources Corp.*, 696 F.2d 87 (10th Cir. 1982) (per curiam), where the order that was sought to be appealed determined the total damages of the class but did not indicate how they were to be divided among the members, or *Norwood v. Harrison*, 563 F.2d 722 (5th Cir.1977) (per curiam), where the order fixed the damages but did not say who had to pay them. Here all that remains to be done in the district court is for the members of the class to submit receipts or other evidence showing what they have paid or still owe the institutions; and the district judge made clear that the defendant agencies would be jointly and severally liable to the class members for whatever amounts are shown to be due. See 557 F.Supp. at 1290. Although computing the money owed each class member is not automatic, it is mechanical, is unlikely to engender dispute or controversy, and will require no analytic or judgmental determinations that might affect the questions now before us or give rise to other appealable questions; in particular, the district court will not have the problem of dividing up a pie among competing claimants whose claims in the aggregate exceed the pie. But at the same time, the processing of the individual class members' claims will not be costless, so that if this appeal is allowed and the state persuades us that no damages should be awarded, an expensive computation involving thousands of bills will be avoided. If the district court's order is upheld, still nothing will have been lost by the appeal. For in the unlikely event that any appealable issues arise in computing each class member's damage entitlement, they will not be factually similar to those raised by the present appeal, so there will be no judicial diseconomy if they are considered in a separate appeal.

We conclude that the order directing the state to reimburse (in an as yet undetermined amount) the parents of the class members is properly before us—though this conclusion owes nothing to Rule 54(b). For so far as we can tell nothing remains pending in the district court except calculating the actual amount owed each class member, which as we have said is not the resolution of a separate claim but merely the disbursement stage following what we have determined to have been the final judgment on damages.

Even if we are wrong in thinking that the order to pay is a final, appealable order, we can review it in conjunction with the state's appeal of the permanent injunction. When an order in a case is properly appealed, the court of appeals can consider a closely related order if considering them together is more economical than postponing consideration to a subsequent appeal. See, e.g., *Bittner v. Sadoff & Rudoy Industries, supra*, 728 F.2d at 826–27; *Jenkins v. Blue Cross Mutual Hospital Ins., Inc.*, 522 F.2d 1235, 1237–38 (7th Cir.1975), modified en banc on other grounds, 538 F.2d 164 (1976); *McKnight v. Blanchard*, 667 F.2d 477, 480–81 (5th Cir.1982). Although this doctrine is subject to abuse of the tail-wagging-the-dog variety, which has led to its being given a circumscribed application well illustrated by *Kershner v. Mazurkiewicz*, 670 F.2d 440, 448–49 (3d Cir. 1982) (en banc), none of the limiting factors is present here. The only question we need consider—one we must decide anyway, to satisfy ourselves that we have jurisdiction over the entire appeal—is whether the permanent injunction is appealable. If so, the order to pay is sufficiently closely related to it to be appealable along with it even if not itself a final order.

Permanency and finality are not the same thing. The pendency of an unresolved damage issue could deprive a permanent injunction of its finality, in which event it would not be appealable under 28 U.S.C. § 1291. But 28 U.S.C. § 1292(a)(1) allows the immediate appeal of an interlocutory order granting an injunction, and the

injunction need not be a preliminary one. The statute does not distinguish between preliminary and permanent injunctions; and beginning with *Smith v. Vulcan Iron Works,* 165 U.S. 518, 17 S.Ct. 407, 41 L.Ed. 810 (1897), many cases have allowed orders granting permanent injunctions to be appealed under section 1292(a)(1) or its predecessors. See 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3924, at pp. 67–79 (1977); *id.,* 1983 Pocket Part § 3924 (1984). Only when the denial of a request for a permanent injunction is not definitive (for example, because the district judge has merely denied the plaintiff's motion for summary judgment, and the plaintiff may still get the injunction at the conclusion of the trial) is it not appealable under section 1292(a)(1). See, e.g., *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966); *Donovan v. Robbins,* 752 F.2d 1170, 1172–76 (7th Cir.1985). Grants of permanent injunctions always are. See, e.g., 16 Wright, Miller, Cooper & Gressman, *supra,* § 3924, at p. 67; *Schulner v. Jack Eckerd Corp.* 706 F.2d 1113, 1114 (11th Cir.1983) (per curiam); *Laffey v. Northwest Airlines, Inc.,* 642 F.2d 578, 584 n. 49 (D.C.Cir. 1980).

Although we thus have appellate jurisdiction, we must consider the state's argument that the suit became moot before it was certified as a class action. The state argues that its dispute with the Parkses ended on February 1, 1983—almost a month before the class certification—when the Illinois Supreme Court denied the state leave to appeal the state-court judgment requiring the state to reimburse Lester's living expenses at New Hope. Yet the state continued to refuse to pay Lester's living expenses at Willowglen, where he had been moved to. The refusal was not a contempt of the state court, because that court had not issued an injunction. It had no power to issue one (see Ill.Rev.Stat. 1981, ch. 110, ¶ 275); all it could do was order the state to pick up Lester's full tab at New Hope. Faced with the apparent determination of the state to keep on fighting, the Parkses turned to the district court and got a preliminary injunction ordering the state in effect to pay the arrears at Willowglen as well. If the state had thrown in the towel at this point and agreed not only to pay the Parkses' arrears at Willowglen but, for the future, to stop deducting any part of Lester's monthly expenses, and if the district court had been persuaded of the state's sincerity, the case would have been moot and the court could not have gone on to certify it later as a class action. See *Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975); *Indianapolis School Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam); *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 430, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599 (1976); *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1046 (5th Cir.1981). It is true that a case in this circuit holds that if the defendant "buys off" the named plaintiff while a motion for class certification is pending, the case may not be moot. See *Susman v. Lincoln American Corp.,* 587 F.2d 866, 870 (7th Cir.1978); *cf. United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 398–404, 100 S.Ct. 1202, 1209–1213, 63 L.Ed.2d 479 (1980). Otherwise defendants could postpone certification until the statute of limitations ran, simply by buying off in succession the class members who stepped forward as named plaintiffs— for every time the named plaintiff was bought off, the suit would have to be dismissed. But there is no suggestion that this is what happened here. Indeed, at no time till the filing of the state's reply brief in this court did the state indicate that its dispute with the Parkses is over.

Moreover, even if today that dispute is finally over, the class action would not be moot unless the dispute was over before the class was certified back in February 1983; and the evidence is against such an inference. The state filed a notice of appeal from the preliminary injunction at the same time that it filed its notice of appeal from the permanent injunction and

order to pay, which was in July 1983, months after the class had been certified. A notice of appeal filed more than a year after the order sought to be appealed is a legal nullity, and in any event the state never briefed its appeal from the preliminary injunction and we consider it thoroughly abandoned. But the only important point is that after the class was certified, the state, by appealing from the preliminary injunction, gave an objective indication that it was still at war with the Parkses and not just with the class. Maybe in its heart of hearts the state had conceded the validity of Lester's claim (though not that of the members of the class) back in February. But to make the case moot the state would have had to communicate its change of heart to the Parkses or the district court—which it has never done—in order to give the attorneys for the class a chance to find a substitute class representative. A case does not become moot because one of the parties, while continuing to take all the steps that a live adversary would take to assert his rights, has secretly concluded that come what may he will give his opponent everything the opponent seeks. And even now it is unclear whether the state has committed itself to continue paying Lester's living expenses.

■ The state also argues that the judgment in the Parkses' state-court action was res judicata and hence bars the present suit. This is clearly wrong. The Parkses could neither have joined with their action for administrative review a claim for an injunction or for reimbursement of their past expenditures—the state court, as we said, did not have the power to grant such relief—nor have bypassed the administrative-review process and brought their first and only suit in federal district court. See 20 U.S.C. §§ 1415(b), (c), (e)(2). The administrative-review proceeding was no substitute for an action seeking equitable and monetary relief under the Education for All Handicapped Children Act, and "a litigant should not be penalized for failing to seek unified disposition of matters that could not have been combined in a single proceeding." 18 Wright, Miller &

Cooper, Federal Practice and Procedure § 4412, at p. 93 (1981); see Restatement, Second, Judgments § 24, comment g; § 26, comment c (1980).

■ The Parkses' collateral estoppel argument is as unavailing as the state's res judicata argument. They argue that the state should be estopped to deny that it has violated the Act, since the state court found that it had violated the Act. But the state court relied very heavily on the district court's first opinion in this case, and a court cannot use its own preliminary-injunction findings to estop a party to contest those findings at the trial on the merits. See, e.g., *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). In any event, if the Parkses wanted the district court to invoke collateral estoppel "offensively," that is, to bar the state's defending itself against their suit, they had to ask the district court, and they did not. Since the doctrine of offensive collateral estoppel requires an exercise of "broad discretion" by the district court, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), it cannot be applied in the first instance by the appellate court except in the clearest of cases, which this obviously is not.

■ We come at last to the question whether the permanent injunction was proper. This depends on whether the state has violated the Education for All Handicapped Children Act by requiring parents to pay any part of the living expenses of handicapped children who are placed in a private facility on the ground of developmental disability rather than of educational need. The issue can be focused by considering a series of hypothetical cases. In the first, a deaf and blind child, perfectly capable of living at home, is institutionalized on the basis of a judgment that he can get a better education in a more controlled environment. His living expenses in the institution would be expenses of his special education within the meaning of the Act and his parents would be entitled to reim-

bursement for them. It is true that the Act does not specify room and board in residential institutions as components of a "free" public education, that "special education" is defined as "instruction," and that the detailed list of "related services" does not include room and board. But the fact that "special education" covers education in institutions (including hospitals, which are primarily residential institutions), 20 U.S.C. § 1401(16), and that "related services" covers transportation, § 1401(17), suggests that Congress took for granted that room and board were components of a free public education when the education had to be conducted in a residential institution, and mentioned transportation separately in order to make clear that the expense of commuting to a day school would also be covered. And however the statute should be interpreted as an original matter, Illinois does not challenge the validity of the federal regulation that explicitly requires reimbursement of the child's living expenses in an educational institution. See 34 C.F.R. § 300.302; *Doe v. Anrig*, 692 F.2d 800, 810 n. 20 (1st Cir.1982) (overruled on other grounds in *Doe v. Brookline School Comm.*, 722 F.2d 910 (1st Cir.1983)); *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir.1983).

In our second hypothetical case, the child is in a coma, and is institutionalized because he cannot be cared for at home. We understand the plaintiffs to be conceding (and the Supreme Court's opinion in *Rowley* implies, see 458 U.S. at 202–03, 102 S.Ct. at 3048–49) that since the child would be completely uneducable in his condition— since he could not benefit from special education no matter how expensive—his living expenses in the institution would not be chargeable to the state under the Act. They would not be expenses of or related to education, made pursuant to the "individualized education program" that the law requires the state to create for each handicapped child. See 20 U.S.C. §§ 1401(18), 1412(4), 1414(a)(5).

In the third case, an intermediate case that is similar but not identical to this case, the child cannot be cared for at home because of some purely physical problem, but, because of that problem, neither can he be educated unless he is institutionalized. See *Irving Independent School District v. Tatro*, —— U.S. ——, 104 S.Ct. 3371, 3378 n. 11, 82 L.Ed.2d 664 (1984). Maybe he requires continuous medical attention which he could not get in a regular day school. So he must be institutionalized for educational reasons but equally for medical reasons. If one analogized the failure to reimburse the living expenses of such a child to a common law tort, the conclusion would be that the state was not liable for them; if the child will have to live in an institution anyway, regardless of his educational needs, those living expenses are not caused by his educational needs, for they will be incurred whether or not any effort is made to educate the child. Cf. *New York Central R.R. v. Grimstad*, 264 Fed. 334 (2d Cir.1920); *Weeks v. McNulty*, 101 Tenn. 495, 48 S.W. 809 (1898); Prosser and Keeton on the Law of Torts § 41, at pp. 265–66 (5th ed. 1984). But the Education for All Handicapped Children Act is not a tort statute, and to read it as one would lead to the odd result that the more the child's handicap interfered with his living, and not just with his education, the more his parents would have to pay. This result is inevitable to some extent; if the child is so far handicapped as to be unconscious, and is thus wholly uneducable, he falls outside the protection of the Act even though his handicap is more rather than less severe than that of the children protected by the Act. And even within the class of those children who are educable, it can be argued that the limited funds allocated for the education of the handicapped could be employed more productively on a child likely to make real educational progress with their assistance than on one too severely retarded to benefit much at all.

However these considerations might seem to balance out as an original matter, the courts that have considered the question have rejected the argument that a state can avoid its obligations under the

Act by showing that the child would have had to be institutionalized quite apart from educational needs that also required institutionalization. See *Kruelle v. New Castle County School District*, 642 F.2d 687, 693–96 (3d Cir.1981); *Gladys J. v. Pearland Independent School District*, 520 F.Supp. 869, 876 n. 8 (S.D.Tex.1981); and other cases cited in Note, *Defining the Scope of Residential Placement and Related Services Under the EHA: Difficult Questions Left Unanswered in Illinois—In re Claudia K.*, 32 DePaul L.Rev. 483, 510–11 n. 132 (1983). And this is an easier case for liability. It is not true, or at least not proved, that Lester and the other members of the class are in such a condition that they could not be kept at home even if no one were concerned with their educational needs. The basic meaning of developmentally disabled in the Illinois statute, as in the professional literature, see, e.g., Thompson & O'Quinn, Developmental Disabilities, ch. 1 (1979), is mentally retarded; and parents who are indifferent to the mental deficiencies of their severely retarded child can raise the child quite comfortably at home—it is as if the child's infancy were prolonged. In light of the close connection between mental retardation and special educational need, it comes as no surprise that developmental disability, far from being an exempted category, is an important subcategory of the handicaps covered by the Act. Although the Act does not use the term developmental disability, it defines "handicapped children" to include children who are "mentally retarded," or are "seriously emotionally disturbed," or are "other[wise] health impaired," or have "specific learning disabilities." 20 U.S.C. § 1401(1). And the regulations under the Act (whose validity the state, again, does not challenge) make clear that these terms include such conditions as autism, brain injury, epilepsy—and in fact everything else that comes within the state statute's, and the profession's, definition of developmentally disabled. See 34 C.F.R. §§ 300.5(b)(4), (b)(7), (b)(9). A later federal statute, the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000 *et seq.*, does use the term

"developmental disability" and provides additional assistance for these unfortunate people, in this respect supplementing the Education for All Handicapped Children Act. See 42 U.S.C. § 6000(b)(2)(A). But there is no suggestion that Congress thought they had been excluded from the earlier Act; they manifestly had not been.

So what the State of Illinois has done is to carve out a class of handicapped children and deny them the full reimbursement that the Education for All Handicapped Children Act, as authoritatively construed in a regulation that the state does not challenge, entitles them to. True, it does this only in cases where the child is placed in a residential facility "because" he is developmentally disabled, rather than "because" he is handicapped and needs special education. But in light of what developmental disability means, the distinction between these causes is purely verbal. To assign a person to a residential facility because his mind is backward is, except perhaps in the severest cases, to assert a need for special education. With persons as severely retarded as Lester Parks the scope for education is extremely limited, but we do not understand the state to be arguing that Lester or the other members of the class are uneducable. Nor would such an argument be likely to succeed (see, e.g., *Abrahamson v. Hershman, supra*, 701 F.2d at 228); 3–6 year olds are educable. The state might as well have said, we choose to classify as developmentally disabled those children whose only need is for special education.

◼ The next question is the propriety of the damages remedy. The Education for All Handicapped Children Act creates a private right of action against state agencies (the parties agree that in naming the heads of the various state agencies as the defendants in this case the plaintiffs meant to sue the agencies, not the defendants in their individual capacities, cf. *Brandon v. Holt*, —— U.S. ——, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)), which means, against the state; and the court (state or federal) is to "grant such relief as the court deter-

mines is appropriate." 20 U.S.C. § 1415(e)(2). There is no reference in either the statute or the legislative history to damages. We think the omission is significant. It is true that since the Act was passed "in order to assure equal protection of the law," 20 U.S.C. § 1400(b)(9); see *Smith v. Robinson,* — U.S. —, 104 S.Ct. 3457, 3468–70, 82 L.Ed.2d 746 (1984)— which is to say under the authority granted to Congress by section 5 of the Fourteenth Amendment—the Act would not violate the Eleventh Amendment if it provided a damage remedy against the state. See *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). But that does not answer the question whether it does provide such a remedy. Mindful of the frictions that arise whenever the states' historical immunity from suit in federal court is withdrawn, the Supreme Court has told us to require a clear showing of congressional intent before we conclude that it has been. See, e.g., *Quern v. Jordan,* 440 U.S. 332, 343–44, 99 S.Ct. 1139, 1146–47, 59 L.Ed.2d 358 (1979). But this directive cannot carry the day for the state. The purpose of sovereign immunity is to protect the public fisc; and having explicitly authorized suits against the states for "appropriate relief" that will often require state expenditures, Congress in the Education for All Handicapped Children Act may be thought to have abrogated that immunity explicitly.

On the other hand, the subsection on judicial relief appears in a section captioned "Procedural Safeguards," 20 U.S.C. § 1415, and is stated in terms of the rights of a "party aggrieved." This suggests that the civil action created by subsection (e)(2) may have been intended merely to authorize judicial review of agency action, and not to create a right to seek damages. Jurisdiction to review agency action is frequently given to district courts, especially where, as here, the action is informal in character. See, e.g., *Illinois Dept. of Public Aid v. Schweiker,* 707 F.2d 273, 276–78 (7th Cir.1983); *Rockford League of Women Voters v. Nuclear Regulatory Comm'n,* 679 F.2d 1218, 1221 (7th Cir. 1982); Currie & Goodman, *Judicial Review of Federal Administrative Action: Quest for the Optimum Forum,* 75 Colum.L.Rev. 1 (1975). It seems unlikely, moreover, that a majority of the Congress would have wanted to authorize federal courts to impose on the states potentially heavy monetary liabilities at the behest of private plaintiffs, especially when injunctive relief alone, directed as it usually will be to requiring the states to maintain expensive programs, will impose such liabilities indirectly. It is not as if the Act had been passed to eliminate traditionally wrongful practices. That participation in the Act is voluntary is some evidence that a state's refusal to devote much greater resources to educating handicapped than normal children is not such morally wrongful conduct as Congress could be expected to make tortious by creating an automatic damage remedy. If such refusal is discriminatory, it is discriminatory in a special (if frequent modern) sense: not as a refusal to treat equally, but as a refusal to rectify a natural inequality (that between the educability of a handicapped and a normal child) by devoting more resources to the victims of the inequality.

Although it could well be concluded that there is no damage remedy at all under the Education for All Handicapped Children Act, no court has yet embraced this conclusion (the issue is an open one in the Supreme Court, see *Smith v. Robinson, supra,* 104 S.Ct. at 3473 n. 24)); nor need we do so in order to decide this case. The courts of appeals that have indicated (always in dictum) that damages might be available under the Act limit that availability to circumstances more extraordinary than those in this case. See *Anderson v. Thompson,* 658 F.2d 1205, 1213–14 (7th Cir.1981) (physical danger to child, or bad faith by state); *Miener v. Missouri,* 673 F.2d 969, 980 (8th Cir.1982). Although two district court decisions evince a more liberal approach, see *Gregg B. v. Board of Education,* 535 F.Supp. 1333, 1338–39 (E.D.N.Y.1982); *Monahan v. Nebraska,* 491 F.Supp. 1074, 1094 (D.Neb.1980), modified on other grounds, 645 F.2d 592 (8th

Cir.1981), the approach taken in *Monahan* was implicitly rejected by the district judge's circuit in *Miener*.

 That does not end our inquiry into the propriety of the district court's giving the plaintiffs *some* monetary relief. A court of equity can issue orders, monetary in character, that are ancillary to its equitable judgments, and the power is not limited to such obvious examples as contempt and attorney's fees for resistance to the judgment. See, e.g., *Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir.1983). This principle is applicable to the present case even if, as we have suggested might well be the case, section 1415(e)(2) was intended merely to create an avenue for judicial review of agency action (here the action of the state in refusing to reimburse the living expenses of the handicapped children in full). Such review is equitable in nature, see, e.g., *Mosey Mfg. Co. v. NLRB*, 701 F.2d 610, 613 (7th Cir.1983) (en banc), whether or not exercised (as here) to enjoin the agency, and it therefore includes the power to formulate whatever remedies are necessary to make judicial review effective. See, e.g., *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 187–88, 61 S.Ct. 845, 849–50, 85 L.Ed. 1271 (1941); *Indiana & Michigan Elec. Co. v. FPC*, 502 F.2d 336, 346–48 (D.C.Cir.1974); *Reich v. Webb*, 336 F.2d 153, 158 (9th Cir.1964). On this ground an order to pay the outstanding bills of the parents of handicapped children strikes us as a proper incident (though barely so) to the injunctive relief ordered by the district court. If the state refuses to pay and the parents cannot come up with the money, their children will be ordered out of the institutions. The permanent injunction will be thwarted—all the more clearly since the institutions will not take the children back so long as their bills are unpaid. In authorizing the district court to provide appropriate relief, Congress must have intended that the court be able to do what was reasonable and necessary to make sure that handicapped children receive the services to which the Act entitled them.

"Necessary," however, exaggerates what the district court did here. Living expenses are charged in the amount of $100 a month only against families with annual incomes of at least $15,600, though this is hardly affluence, and though $100 a month is not a trivial amount for a family whose entire income is less than $16,000 a year. But even if most of the class members could pay the past-due bills for living expenses, we do not think the district judge exceeded the limits of his equitable discretion by requiring the state to pay off these old bills, for an illegal charge, rather than forcing the parents to dig down into their pockets for what could be, to them, sizable lump sums.

His order, however, has a much broader sweep. It directs reimbursement of all the expenses that the parents have paid back to 1978. This part of the order cannot be justified as necessary to prevent the children from being expelled from the institutions in which they are receiving their special education. The plaintiffs argue, however, that (1) all they are seeking is reimbursement of certain expenses, not full common law damages; (2) in other words, they are just asking for restitution; (3) it is more than justified by the egregious nature of the state's violation. The first point is correct, but we do not think the statute creates an automatic right of common law damages. Calling what they are asking for "restitution" does not strengthen the plaintiffs' case. Indeed, since restitution, being measured by the wrongdoer's profit rather than the victim's loss, can result in a larger money judgment than damages, see, e.g., Dobbs, Handbook on the Law of Remedies 223 (1973), and partly for this reason is often reserved for the more serious types of wrongdoing, it is even less likely that Congress intended to subject the states to open-ended liability in suits for restitution than to make them subject to suits for damages. The plaintiffs' second and third points we reject. Restitution in the only sense in which it might be thought to add a moral weight to the plea for reimbursement refers to the situation where the defendant has been unjustly enriched at the

plaintiff's expense. See *Iconco v. Jensen Construction Co.*, 622 F.2d 1291, 1295 (8th Cir.1980); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block—Building 1 Housing Development Fund Co.*, 608 F.2d 28, 37 (2d Cir.1979); 1 Palmer, The Law of Restitution § 1.1 (1978); cf. *Hurry v. Jones*, 560 F.Supp. 500, 508 (D.R.I.1983). That might be the situation here if Illinois had taken the plaintiffs' money and used it for some activity unrelated to the needs of handicapped children. But there is no argument that anything of this sort has occurred. So far as appears, any money that the state saved by not fully reimbursing the parents of handicapped children has gone into programs for the benefit of those children. And finally we do not think the state's behavior was egregious. The state has an arguable position; we have rejected it, but it is not therefore insubstantial.

We conclude that the district judge erred in ordering reimbursement of the parents' overpayments beyond what was necessary to clear outstanding bills that unless paid would cause the handicapped children to be expelled from the institutions in which the state had placed them. Of course this favors those parents who have not paid their bills over those who have, but presumably the former are, on average at least, more necessitous and not just less responsible.

■ The plaintiffs cite as an alternative basis for monetary relief section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Although they concede as they must in light of *Smith v. Robinson, supra,* that the more detailed provisions of the Education for All Handicapped Children Act supersede section 504 within the later Act's domain and thus extinguish any separate damages claim since 1978, they argue that section 504 allows them to get damages back to 1977 (we do not know why this was made the damage cut-off date). Passing the murky question of just what pecuniary remedies section 504 provides, we do not interpret it to force states to create special programs for handicapped children. Section 504 merely provides that "no *otherwise qualified* handicapped individual in

the United States, ... shall, *solely by reason of his handicap,* be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ..." (emphasis added). This protects a handicapped person from being denied the same benefit (a job, or whatever) as a normal person but does not require the state to devote extra resources to bringing the handicapped up to the level of the normal. See *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 411–13, 99 S.Ct. 2361, 2369–71, 60 L.Ed.2d 980 (1979).

■ Lastly, the state complains about the district court's including in the decree the Governor's Purchase Care Review Board. Although the Board's relationship to the decisions that resulted in the denial of reimbursement to the parents of handicapped children for living expenses is obscure, the district judge was justified in including the Board in the decree to make sure that the decree is not thwarted by the omission of a state agency that might by inaction hamper the carrying out of its provisions.

To summarize, the permanent injunction is affirmed, as is the part of the district court's order concerning monetary relief that directs the state to pay the outstanding bills of the class members for living expenses. However, the part of that order that directs the state to reimburse the class members for the bills that they have already paid is reversed. No costs shall be awarded in this court, and Circuit Rule 18 shall not apply to the further proceedings in the district court.

AFFIRMED IN PART AND REVERSED IN PART.